## LAMBERTI v. SUN PRINTING & PUBLISHING ASS'N.

(Supreme Court, Appellate Division, Second Department. March 2, 1906.)

1. LIBEL—CONSTRUCTION OF PUBLICATION—CHARGING CRIME.

A jocular publication in a newspaper, headed "Black Hand On His Back," and stating that a wager was made with plaintiff that he had a black hand on his back, showing that he belonged to the "Black Hand Kidnappers," and that the one wagering with him caused a black print of a hand to be made on plaintiff's back, and that the exhibition of the print to plaintiff greatly excited him, until he was convinced that it was a joke, could not be construed as charging membership in the "Black Hand."

[Ed. Note.—For cases in point, see vol. 32, Cent. Dig. Libel and Slander, § 99.]

2. SAME—RIDICULE.

The article contained no such ridicule as to render it actionable.

[Ed. Note.—For cases in point, see vol. 32, Cent. Dig. Libel and Slander, § 99.]

Appeal from Special Term, Kings County.

Action by Rocco Lamberti against the Sun Printing & Publishing Association. From a judgment overruling a demurrer to the complaint (95 N. Y. Supp. 329), defendant appeals. Reversed.

"Black Hand on His Back.

"Janitor Lamberti Thought it Was a Curse Instead of a Wicked Joke.

"Rocco Lamberti, janitor of the civil court at Second avenue and First street, and a protégé of Timothy D. Sullivan, was marked with a black hand yesterday, and it was several hours before his friends could restore him to a normal condition. In Essex street he announced that he would aid his fellow countrymen in the Italian Chamber of Commerce in running down the Black Hand Kidnappers. 'Why, you belong to it yourself,' said big Jack Martin, Martin Engel's manager. 'A man told me he met you in a Turkish bath, and saw the black hand tatooed on your back.' 'Liar! thief! villian!' shouted Rocco. 'I will take the man's word,' said Martin. 'He swears he saw the mark.' 'Here is $20,' shouted Rocco, 'to prove he is a liar.' 'Go downstairs in the basement,' said Martin, 'and if there is not a black hand on your back I will lose the bet.' A committee of the Essex Market Bar Association followed Rocco to the basement. While he was removing his shirt and under shirt, Martin blackened his right hand with burned cork. 'You scoundrels, show me where there is a black hand on my back,' said Rocco, when he was stripped to the waist. 'Right there,' said Martin, as he slapped him on the back. The committee agreed with Martin, but to convince Rocco they had to procure two mirrors. When he saw the imprint on his back he turned pale, and shouted: 'There must be a curse on me, a curse on me. I swear that the mark was not there this morning. I denounce them. Remove it from me, even if you have to cut off my flesh.' Rocco refused to be consoled, and it required the services of several of the crowd to restrain him. When he was finally quieted, the black mark was removed, and he was told it was a joke, but the committee which celebrated with his money last night unanimously decided that he lost the bet."

He alleged: "That by the use and force of the said words thus composed and published by the defendant of and concerning plaintiff herein, it was meant to have it understood and believed that plaintiff had a 'black hand tatooed on his back,' which was an emblem or symbol of what is known as the 'Black Hand' or 'Black Hand Society,' which is known as a secret society or association composed of assassins, murderers, blackmailers, thieves, and kidnappers, and which members are pledged to secrecy under penalty of death, and who make it their business to threaten, kidnap, blackmail, rob, and kill persons for the purpose of blackmail, extortion, and robbery, by means of such unlawful threats and acts. And it was further meant to have it understood and

believed that plaintiff was tatooed with a black hand on his back as a symbol or indication that plaintiff was a member or constitutent part of and belonging to said criminal association or society, and that he is or was at the time of said publication, when the press in the United States at large, and in the city of New York in particular, was full of articles reporting the commission of numerous murders, kidnapping, blackmailing, and extortion cases, alleged to have been committed by said secret society, or the members thereof, a member of the said society or association. And it was further meant to have it understood and believed that plaintiff was pledged to the 'Black Hand' or 'Black Hand Society,' and that such a symbol or insignia of the 'Black Hand' or 'Black Hand Society' was imbedded into his flesh, and by such insignia or emblem was known to have pledged secrecy to the 'Black Hand Society.' That the foregoing false, libelous, malicious, and defamatory matter was intended and calculated to and did expose plaintiff to public ridicule, contempt, shame, disgrace, hatred, and obloquy, and intended to degrade, an did degrade, plaintiff, and has injured plaintiff in his good name and reputation, which he had heretofore enjoyed, all to his damage in the sum of fifteen thousand ($15,000) dollars. That by reason of the said publication in defendant's newspaper, plaintiff has suffered, and continues to suffer, great mental distress, anguish, and humiliation, and also received a severe shock to his nervous system. That by reason of the aforesaid publication or composition of and concerning plaintiff, plaintiff has been, and still is, called and known as the man with the 'Black Hand,' and the 'Black Hand Kidnapper,' and the man with the 'Black Hand Tatooed on his back,' meaning that this plaintiff is a member of the 'Black Hand Society,' which is known as a secret association composed of assassins, murderers, blackmailers, thieves, and kidnappers, who make it their business to threaten, blackmail, and kill individuals for the purposes of blackmail, extortion, and robbery, all to his great annoyance, humiliation, detriment, and disgrace, and has been shunned from society and avoided by his friends and acquaintances."

Argued before JENKS, HOOKER, RICH, and MILLER, JJ.

Franklin Bartlett, for appellant.

Joseph Pascocello, for respondent.

JENKS, J. To me it seems an absurd supposition that the article justifies the innuendo that it charged membership in the band known as the "Black Hand." Any fair-minded man—any man of ordinary ability and intelligence—reading the entire print, could not so construe it. He who runs would read it as the story of a practical joke, based on a physical pun (the existence of a "black hand" on the plaintiff's back), and published to provoke laughter. My reading of the opinion in Morrison v. Smith, 177 N. Y. 3661, 69 N. E. 725, and the opinion therein referred to, read by McLaughlin, J., in the Appellate Division (83 App. Div. 206, 82 N. Y. Supp. 166), is that the Court of Appeals decided that, although an innuendo must fall, the complaint may survive if no innuendo was necessary to sustain a cause of action. We followed this rule in Wuest v. Brooklyn Citizen, 102 App. Div. 480, 92 N. Y. Supp. 852, and I shall abide by it. I think that the article is well within the words of Paxson, J., in Press Co. v. Stewart, 119 Pa. 584, 603, 14 Atl. 51: "The matter has been very much magnified, and an importance attached to it which it does not deserve. An actionable libel cannot be created out of nothing." Of course, the mere fact that the print was a jest does not put the defendant out of peril. Ridicule may ruin a reputation or a business. On the other hand, although there is more or less contempt in the laughter that it excites (Cent. Dict.), it may be merely "sportive or thoughtless," and so as to be distinguished from

derision (Stand. Dict.). The contempt here, if any, would naturally arise from the fact that the plaintiff should have fallen a victim to the catch, when the reader could not have been so insnared, and would not mar the plaintiff's reputation or his business. In Triggs v. Sun Printing & Pub. Ass'n, 179 N. Y. 144, at page 155, 71 N. E. 739, at page 742 (62 L. R. A. 612, 103 Am. St. Rep. 841), the court (per Martin, J.) state the rule:

"If, however, they can be regarded as having been published as a jest, then it should be said that, however desirable it may be that the readers of and the writers for the public prints shall be amused, it is manifest that neither such readers nor writers should be furnished such amusement at the expense of the reputation or business of another."

And the learned judge further says that jest is not justification, "unless it is perfectly manifest from the language employed, that it could in no respect be regarded as an attack upon the reputation or business of the person to whom it related." It seems to me "perfectly manifest" that the article falls within this exception. As I have said, any fair-minded man would rise from the reading without a thought that the article could be regarded as an attack, actual or covert. He would consider it only as the story of a practical joke, that left unimpaired the repute and the affairs of the butt of the pleasantry. It may be that, as a result of the publication, the plaintiff has received a byname or a nickname that is not agreeable to him. Such epithets often outrun and outlive their origin. Mr. Odgers in his Libel and Slander (page 124) says: "The fact that actual damage has followed from the publication is immaterial in considering what is the true construction of the libel"— citing Lord Colridge, C. J., in Hart v. Wall, 2 C. P. D. 146. Mr. Newell in his work on Slander and Libel lays down the same rule. Page 286. Mere ridicule, not such as is yoked in the various definitions with "hatred, obloquy, or contempt," but such as may be sportive and thoughtless, that may beget laughter, that leaves the temporary victim unaffected in his reputation and his business, is not necessarily libelous. The limitation expressed in Triggs v. Sun Printing & Pub. Ass'n., supra, and the affirmance of King v. Sun Printing & Pub. Ass'n., 179 N. Y. 600, 72 N. E. 1144, thus indicate. While the public press cannot with impunity ruin or affect a man's fair name or his affairs under the guise of joke or jest, on the other hand, it need not be debarred from all humor, even of a personal kind, that begets laughter and leaves no sting. Otherwise its columns might be almost as dull as the pages of The Gazette, or perhaps the courts become frightened, as were the English judges of the sixteenth and seventeenth centuries, at the volume of actions for defamation, when in desperation they applied the rule of in mitiori sensu to the verge of absurdity. Thayer's Preliminary Treatise on Ev. at the Common Law, 288.

I advise that the interlocutory judgment be reversed, with costs, and the demurrer be sustained, with costs. All concur.