[Civ. No. 9080.   Third Dist.   Nov. 21, 1957.]

AUDREY G. MENEFEE, Respondent, v. WINNIFRED R. CODMAN, Appellant.

398

Dan L. Garrett and William B. Boone for Appellant.

Pierce & Brown for Respondent.

VAN DYKE, P. J.—This is an appeal from a money judgment on one count of respondent's complaint and from an order granting a new trial on the remaining two counts as to which the jury had returned defense verdicts. The action was for libel.

Respondent is a resident of Fair Oaks community, near Sacramento. Since 1948 her husband has published a weekly newspaper for which respondent wrote a column dealing with shopping news and her personal thoughts and observations. The Menefees had four young children. In addition to her household duties and her work on the newspaper, respondent also taught psychology part time at Sacramento State College. She participated actively in community affairs and bore an excellent reputation as housewife, mother, church attendant, teacher and writer.

Appellant is a long-time resident of Fair Oaks community. She is descended from a pioneer family, is a member of the Daughters of the American Revolution, owns property in excess of $100,000, and has long interested herself in community affairs, in which she generally takes strong partisan positions and concerning which she has a penchant for public utterances, both verbal and in the form of long letters to the editors of newspapers. She sometimes publishes and circulates tracts of her own. She is an influential member of her community.

Count I of the complaint herein charged that appellant wrote and published of respondent the following:

"Seems strange that such an obscure little person as 'plain Audrey' should assume such a responsibility. ('How one small head . . .' . . . Some of us here think that plain audery . . . should have been named 'Narcissus.' Hunt up your psychology textbooks for that one— . . .)

"Will plain Audrey's 'Operation Europe' or 'Mission to Europe' include other activities besides Telling the World how to become popular in a small town (or is Audrey really qualified to advise them?) and how to run a rural newspaper?"

The second count averred that appellant wrote and published of respondent the following:

"Plain Audrey's Trip to Europe still is causing a lot of local yokel comment whenever mentioned. We see a late movie advertised—could that have been the real reason Plain Audrey went to Europe? The movie is titled 'Under the Paris Sky'— at the Guild Theatre, 35th and Broadway. The gal on the advertisement looks as though she wore a dirndl. When we come across Plain Audrey's column on Paris, where she tells about her trip to the water front, then we'll know. Meanwhile Plain Audrey's water front 'coverage' will intrigue us. But what we all want to know is, Who covered Audrey while Audrey covered the water front? Surely Audrey didn't slip along uncovered—no, she told us she wore a dirndl and an old blouse. Oh, well, we were just reminded of that old game about who took care of the caretaker's daughter. We just changed the wording."

By the third count, respondent alleged that appellant wrote and published of and concerning her, the following:

"The San Juan Record's Associate Editor, no less! reported on her recent trip to Europe that she wore an old blouse and dirndl (was it? or slacks?) along the Paris waterfront. We presume she was 'covering the waterfront'? We feel sorry indeed that she didn't have proper clothes for this assignment, and we venture to suggest that the Editor, Boss, Dear Selden or what-you-prefer open a charge account at I. Magnin's (that is, if his credit rates that good), and then his hard-working little wife won't have to slink along the waterfront in an outdated dirndl (if that's what she wore?)

"Sample Magnin advertising leaflet attached—it says, 'A fulfillment of your most luxurious dreams'—and these dreams go as high as $69.95 for a 'permanently pleated' gown. Time O'Day indicated in advertisement."

It was alleged that there was attached to said writing, and addressed and mailed therewith, an advertisement for nightgowns and negligees. The advertisement contained pictures of ladies in various and sundry types and designs of nightgowns, negligees or other bedroom attire.

Alleging in each count that she had been an instructor and during a part of the years of 1951 and 1952 had been engaged in the occupation and profession of Associate Professor on a part-time basis at the Sacramento State College, that she had for several years been engaged in the occupation of women's editor and associate editor of a newspaper of general circulation, to wit, the San Juan Record, that at all times she possessed and enjoyed a good name and reputation and a wide

following of readers in Sacramento County, respondent asserted that as a natural and proximate result of the alleged publications she had been greatly injured and prejudiced in her reputation, in her calling, occupation and profession as an instructor, editor and columnist, and had lost, and would continue to lose, gains and profits which otherwise would have accrued to her in her said calling, occupation and profession to her damage in the sum of $15,000. Respondent further alleged in each count that by reason of the publications she had been caused to suffer grievous mental suffering and humiliation to her damage in the further sum of $15,000, and that the publications had been made maliciously with the intent to injure her; wherefore she demanded exemplary and punitive damages.

Appellant demurred generally to the pleading, contending that the alleged defamatory publications were each not libelous *per se* or libelous on the face; that only general damages, as opposed to special damages, were pleaded and, therefore, that no cause of action was stated. The demurrers were overruled. Throughout the trial this contention of appellant was asserted by her and it here constitutes one of the major issues on appeal.

In 1944, there was published in the Southern California Law Review, volume 17, page 347, an article by Professor Charles E. Carpenter, the first paragraph of which reads as follows:

''The well established historical distinction between libel and slander is already, by reason of its artificial, illogical and unsound character, sufficiently confusing. But the existing confusion has been increased by the wholly unwarranted doctrine of 'libel per se,' which has recently arisen in California and several other States. This doctrine is to the effect that, if the publication is defamatory on its face—that is if extrinsic circumstances are not necessary to reveal its defamatory character—it is 'libelous per se' and an action may be maintained without alleging or proving special damages. If the defamatory character of the publication is not obvious on its face but is hidden and requires inquiry into extrinsic circumstances to make it so, then it is not actionable unless special damages are alleged and proved. A peculiarity of the situation is that the parents of this odd creature—the courts—do not realize, despite the labor pains of its birth, that they have brought forth a child. This article is written for the benefit of lawyers and courts of the States that have produced the new offspring, so that they may see that it is a new creature,

and that it is ugly and illegitimate and ought promptly to be strangled.''

As though fearful that the attack of Professor Carpenter and other law writers upon the misbegotten infant's right to live might result in judicial filicide, the Legislature in 1945 legitimated the child by enacting chapter 1489 of the statutes of that year. Therein it declared that a libel which is defamatory without the necessity of explanatory matter, such as inducement, innuendo, or other extrinsic fact, is said to be a libel on its face; that defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof; that special damage consists of all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other. Respondent contends that the defamatory words pleaded in each count are libelous *per se* and further contends that if this be not true then she has sufficiently pleaded and proved special damages as that term is statutorily defined. [1] If she is right in her first contention, then we do not reach the second, for if a publication is libelous on its face then all damages—general, special or exemplary—properly pleaded under applicable rules of pleading may be recovered according to the proof.

The sting of the charge in Count I of the complaint is found in the matter we have quoted: ''Seems strange that such an obscure little person as 'plain Audrey' should assume such a responsibility. ('How one small head ...' ... Some of us here think that plain audery . . . should have been named 'Narcissus.' Hunt up your psychology textbooks for that one.)'' The Greek myth centering around Narcissus and his affair with Echo is commonly known and understood. ▇ While to state that a person ought to have been named, that is that a person resembled, Narcissus could scarcely be called complimentary, it would not, however, be a statement libelous on its face. ▇ But a different connotation entirely is brought in by the direction: ''Hunt up your psychology textbooks for that one,'' for it was shown that from the myth of Narcissus there has stemmed a term commonly used in psychology to classify, with respect to adults, a definite pathology called narcissism or narcism. When appellant instructed her readers to hunt up their psychology textbooks

to discover what she meant by saying respondent ought to have been named Narcissus, she made it plain that she was not referring to anything innocent in nature. Even the dictionary uses the term "narcissism" as meaning, psychologically speaking, "Erotic feeling aroused by one's own body and personality, regarded by Freud as a normal state in sexual development; pathologically, fixation at, or regression to this stage." There was definite proof as to what appellant's readers would have found had they obeyed her admonition. A qualified witness, a professor of psychology from Boston University, testified that the word "Narcissus" has a special meaning to a psychologist in the field of abnormal psychology; that it refers to abnormal self-love; that is to a form of self-love in which a person falls in love with himself as a man might fall in love with a woman; that it is an abnormal psychological characteristic or trait; that there are degrees of this trait as of any trait; that the term would not be used to refer to normal behavior; that it would only be used to refer to psychopathic or abnormal behavior; that the degrees would extend all the way from a person who did not engage in any overt sexual practices related to himself to a person who also engaged in masturbation and other forms of abnormal sexual behavior to a very excessive extent and to the exclusion of sexual relations with members of the opposite sex; that one suffering from narcissism would find it impossible to have normal sexual relations with a member of the opposite sex; that while it is not common for psychologists to refer to a person suffering from narcissism as a Narcissus he could be so called and there would be no mistaking what was meant; that the terms defined had no other meaning in psychology textbooks except the abnormal condition above described, and that every textbook on abnormal psychology described narcissism as did all textbooks on general psychology which contained a section on abnormal psychology. By directing her readers to texts on psychology, appellant plainly indicated that she was not dealing with the innocuous Greek myth, but with something they would find related to that myth in psychology textbooks. It cannot be properly argued with respect to the pleading in Count I that there is any ambiguity in the publication by reason of which an innocent and nonlibelous meaning could fairly be ascribed thereto. ▮ To ascribe to any individual the sexual deviation described in psychology textbooks as constituting narcissism, whatever the degree of such deviation, is to expose that person to hatred, contempt,

ridicule, obloquy, and to cause him to be shunned or avoided. And certainly such a publication has a tendency to injure him in his occupation. Particularly is this true when spoken of a teacher or a writer. ■ We hold that the publication stated in Count I of respondent's complaint was libelous on its face and, therefore, did not require the pleading of explanatory matters such as inducement, innuendo, or other extrinsic fact. ■ Of course, the fact that such matters were pleaded is immaterial here for if matter libelous on its face be shown, a pleading of explanatory matter may be disregarded as surplusage. (*Bates* v. *Campbell*, 213 Cal. 438 [2 P.2d 383].)

By the second allegedly libelous publication appellant told her readers: "Plain Audrey's Trip to Europe still is causing a lot of local yokel comment whenever mentioned. We see a late movie advertised—could that have been the real reason Plain Audrey went to Europe? The movie is titled 'Under the Paris Sky'—at the Guild Theatre, 35th and Broadway. The gal on the advertisement looks as though she wore a dirndl. When we come across Plain Audrey's column on Paris, where she tells about her trip to the water front, then we'll know. Meanwhile Plain Audrey's water front 'coverage' will intrigue us. But what we all want to know is, WHO covered Audrey while Audrey covered the water front? Surely Audrey didn't slip along uncovered—no, she told us she wore a dirndl and an old blouse. Oh, well, we were just reminded of that old game about who took care of the caretaker's daughter. We just changed the wording."

Appellant argues that the foregoing publication was not libelous on its face because from the whole publication it is apparent that what is said is fairly susceptible of an innocent and nondefamatory meaning. She cites 30 California Jurisprudence 2d 742-743, and *Babcock* v. *McClatchy Newspapers*, 82 Cal.App.2d 528, 533 [186 P.2d 737].

■ Respondent asserts that in this publication the sting of the charge is in the question, "WHO covered Audrey while Audrey covered the water front?", insisting that the words are used in the sexual sense and pointing to the dictionary definition appearing in Webster's New International Dictionary, wherein the verb "cover" is defined *inter alia* as "to copulate with (a female); to serve; as, a horse covers a mare." Respondent points to testimony that gossiping groups discussing this letter considered that appellant was accusing respondent of street-walking in Paris to cover the expenses of

her European trip. Appellant cites the numerous definitions of the word "cover" to be found in dictionaries and insists that the words she used are to be construed according to innocent meanings. Her own testimony was that by the word "cover" she meant "watched by government agents" lest respondent engage in subversive activities of the communist variety. The question then in construing the pleading is whether or not the publication as pleaded is libelous on its face. If the words used are reasonably susceptible of nondefamatory construction, then Count II does not state a cause of action unless it includes, as respondent contends it does, a proper pleading of special damage within the terms of the statute. It is difficult to ascribe an innocent meaning to this publication. The use of the verb "cover" as meaning copulation is as indicated by the dictionary definition generally connected with the breeding of animals; it might be described as a barnyard colloquialism but appellant asserted that plain Audrey's trip to Europe was causing a lot of local yokel comment whenever mentioned and city folk often refer to the farm population as "local yokels." Then comes the reference to the movie and the attached advertisement which shows a woman scantily clad in what appears to be a negligee, a brassiere, and little else. The title of the movie is given in the advertisement as "Under the Paris Sky." The foregoing preface is followed by the words "Meanwhile Plain Audrey's water front 'coverage' will intrigue us. But what we all want to know is, WHO covered Audrey while Audrey covered the water front?" The implication is plain that somebody covered Audrey while she was on the waterfront, and the query is who was it that did so. "Surely," appellant continued, "Audrey didn't slip along uncovered," all of which appellant asserted reminded her "of that old game about who took care of the caretaker's daughter." Is all of this reasonably susceptible of an innocent construction? Isn't it plain that appellant is here seeking to expose respondent to ridicule, if no worse? We think the only reasonable construction of the whole publication is that upon its face it does expose respondent to ridicule. That much we think is certain even if it can be reasonably argued that the publication does not charge respondent with prostitution. But if the publication did expose respondent to ridicule, and such we think is its fair meaning, then it was libelous, and it was unnecessary, in stating a cause of action, to plead explanatory circumstances and special damage.

406

The third count presents little difficulty. The libelous matter reads: "The SAN JUAN RECORD's Associate Editor, no less! reported on her recent trip to Europe that she wore an old blouse and dirndl (was it? or slacks?) along the Paris waterfront. We presume she was 'covering the waterfront'? We feel sorry indeed that she didn't have proper clothes for this assignment, and we venture to suggest that the Editor, Boss, Dear Selden or what-you-prefer open a charge account at I. Magnin's (that is, if his credit rates that good), and then his hard-working little wife won't have to slink along the waterfront in an outdated dirndl (if that's what she wore?) Sample Magnin advertising leaflet attached—it says, 'A fulfillment of your most luxurious dreams'—and these dreams go as high as $69.95 for a 'permanently pleated' gown." Attached to the writing and published with it as a part thereof was an advertisement for nightgowns and negligees. Here the reasonable construction of the entire publication is that respondent wore an old blouse along the Paris waterfront and that she was thus unsuitably clad; that her husband should not have condemned her to slink along the waterfront in such clothing and should have furnished her with proper clothes for her trip along the waterfront, that is, with expensive nightgowns and negligees. Fairly construed, the publication, taken as a whole, exposed respondent to contempt, ridicule, obloquy and avoidance. It also had a clear tendency to injure her in her occupation as teacher and writer. It was libelous on its face.

Although appellant contends that respondent failed to prove a cause of action, it is apparent that the contention is concerned with the necessity of pleading and proving special damages, which contentions we have already treated. It could not be claimed that the evidence was insufficient to support the verdict of the jury as to Count I, nor insufficient to have supported verdicts on Counts II and III had the jury ruled in favor of respondent on those counts, for it was substantially shown that there was much talk and comment among people living in the Fair Oaks community after the various libelous publications were made, the comment ranging all the way from ridicule to assertions that appellant was charging respondent with sexual misbehavior of a gross nature. There was testimony also that respondent did suffer general damage as defined by Civil Code, section 48a, subdivision 4, that is, loss of reputation, shame, mortification, and hurt feelings. There was substantial support also for the jury's finding as

to Count I that appellant had been motivated by express malice in her writings concerning respondent. In short, the record fully supports the jury's finding that as to Count I respondent had been generally damaged in the sum of $100 and that she was entitled to exemplary damages in the sum of $5,000. The jury found in appellant's favor on Counts II and III, but had their verdicts been otherwise reasonable awards of general and exemplary damages would have been supported.

Appellant contends that the case was pleaded, tried and submitted to the jury on the theory that the publications were not libelous *per se,* and, consequently, respondent, having recovered a judgment based upon the testimony of her witnesses as to the meaning of the language used, it does not now lie in her mouth to claim that the language was not subject to varying interpretations. This contention is not sound. Pleading extrinsic facts by way of innuendo, colloquialism, and inducement does not constitute a waiver of a right to recover general damages or, if malice be present, exemplary damages where the defamatory statements are libelous *per se.* (*Bates* v. *Campbell, supra,* p. 443.)

Appellant argues there were various prejudicial errors committed by the trial court in instructing the jury. The first assignment of error has to do with an instruction addressed to the first count. The court read the publication charged to be libelous, as set forth in Count I, and then continued by telling the jury that a narcissus is a flower; that it is not ordinarily libelous to refer to a person, particularly a woman, as a flower; that that use of the word narcissus would ordinarily be a term which could have an innocent meaning and which, therefore, would not be libelous on its face. The court continued to say, however, that when in the same publication, which admittedly referred to respondent, appellant had said "Hunt up your psychology textbooks for that one," that the appellant was clearly instructing her readers that the meaning she intended to convey was a special one and was to be found in psychology textbooks; that, therefore, if they found from the evidence that the special meaning of "Narcissus" as defined in a psychology textbook referred to a person afflicted with abnormal self-love, then the publication if untrue and unprivileged was libelous. In view of what we have already said in discussing the contention that the publication referred to was not libelous on its face, we think no further discussion of this assignment of error is

necessary. We hold the instruction stated the law. Appellant further contends that several instructions were given at the request of respondent to the effect that if the publications were made maliciously respondent could recover punitive damages without regard to proof of actual damage or "the existence of libel." The reference is to instructions such as the following:

"The question as to whether or not you should allow exemplary or punitive damages in addition to the compensatory damages allowed, if any, turns upon the question of whether or not such publication was made maliciously. You are entitled to add such sum by way of exemplary or punitive damages and to award the same to the plaintiff in addition to the actual or compensatory damage against the defendant, if you find the defendant was actuated by malice in fact towards the plaintiff; . . ."

By this instruction, says appellant, the jury were told that respondent was entitled to punitive damages upon the mere proof of malice without any necessity of finding any further facts, such as whether or not respondent had been libeled and whether or not she had suffered any actual damage. But there was libel as a matter of law. That is what is meant by libel *per se*. It was for the court in this case to settle that issue. (30 Cal.Jur.2d p. 726; *Peabody* v. *Barham*, 52 Cal.App.2d 581, 584 [126 P.2d 668].) The second part of the challenge cannot be sustained because proof of actual damage in the sense of money loss in this case was unnecessary to the recovery of general damages, and, if malice was present, to the recovery of exemplary damage. Actual, that is general, damage is presumed from libel *per se* and as we have said there was direct proof of such damage. A jury may make a reasonable award in such a case without further proof just as the jury may award a reasonable sum in other tort cases on proof of pain and suffering wrongfully inflicted.

The court advised the jury in considering whether the defendant was guilty of malice in fact it was proper to consider, among other things, "Any repetition of the libelous statements made in the answer filed by the defendant, if you find from the evidence that such repetition was in bad faith." The court further instructed the jury:

"You are instructed that where a defendant reiterates libelous charges in her answer and offers no evidence to prove their truth and you are satisfied that such charges were made with knowledge of their falsity and maliciously and not in

good faith, such plea, if so made, is an aggravation of the wrong done to the plaintiff and may be considered by you in assessing exemplary damages.''

▄▄▄ Appellant asserts, as is true, that she did not plead the defense of truth or justification and that the only reiteration of libelous matter occurred in the answer when she quoted fully what she had written because respondent in her complaint had omitted something. The matter omitted and filled in by the answer appears to have been of little moment. It neither added to nor detracted from the libel. Appellant's argument is that the instruction is inaccurate in that there had been no reiteration of libelous statements and the court indirectly told the jury that there was. The jury ought not to have been instructed on the subject of reiteration of libelous statements in the absence of material reiteration, but the court did not, in fact, tell the jury that there had been reiteration and we cannot assume that the jury so understood. While we cannot justify the giving of the instruction, we do not believe that any prejudice resulted therefrom.

▄▄▄ The court instructed the jury that:

''. . . [O]ne cannot justify his conduct in assailing the reputation of another by saying that he acted merely in jest unless it is perfectly manifest from the language employed that it can in no respect be regarded as an attack upon the person to whom it relates. Nor is the publication of a statement reflecting on the plaintiff rendered any the less libelous by the fact that the defendant circulated the statement merely to amuse her readers.''

In her testimony the appellant had taken the stand that she, in what she said, was merely ''poking fun'' at the respondent; that she was jesting and was not dealing seriously with the subject matter of her statements. The instruction was proper under the circumstances and in view of appellant's testimony. (53 C.J.S. p. 46.)

▄▄▄ Appellant asserts it was error for the court to submit the issue of libel *per se* to the jury, asserting that it is the exclusive function of the court to determine whether a publication is libelous *per se*. (*Peabody* v. *Barham, supra.*) However, we fail to see, in view of our holding that the publications were libelous *per se*, that any detriment could have been suffered by appellant from the court's instructions.

With respect to her appeal from the trial court's order granting respondent a new trial on the second and third

counts of her complaint, it is claimed that the order is not supported by the pleadings or the proof. First, the same attack that was made as to Count I is reiterated as to Counts II and III, that is, that the publications were not libelous *per se* and, therefore, since special damages were not pleaded or proved, the court erred in granting new trials. We have already discussed this assignment. Respondent asserts further in reply to the attack upon the order granting new trial that she did, in fact, plead and prove special damages as that term is defined in the code sections. We think it unnecessary to discuss this contention. We have already held that respondent could recover on these counts without pleading or proving special damages as so defined. If she seeks to recover special damages, and her pleading thereof is imperfect, she can apply to the trial court upon retrial for leave to amend. Among other grounds, the new trial as to Counts II and III was granted upon insufficiency of the evidence. In the state of the record presented here, this was a matter within the discretion of the trial court according as it weighed the evidence and no attempt is made to argue that upon that ground the court acted in abuse of discretion.

The judgment and the order appealed from are affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied December 19, 1957, and appellant's petition for a hearing by the Supreme Court was denied January 15, 1958.