[Civ. No. 22930. First Dist., Div. One. Oct. 28, 1966.]

RUSS ARNO, Plaintiff and Appellant, v. DICK STEWART et al., Defendants and Respondents.

---

*Assigned by the Chairman of the Judicial Council.

956

Belli, Ashe, Gerry & Ellison, Melvin M. Belli, Frederick Cone and Robert L. Lieff for Plaintiff and Appellant.

Bronson, Bronson & McKinnon and Harold R. McKinnon for Defendants and Respondents.

SIMS, J.—Plaintiff has appealed from an adverse judgment entered upon a verdict for defendants in an action in which he sought to recover damages for alleged slander because the defendant Stewart while conducting a television show referred to plaintiff, a paid performer on the show, as an "iron-clad singing member of the Mafia."

Plaintiff contends that the failure of the trial court to instruct the jury that the words uttered were defamatory per se constituted prejudicial error; and that under the circumstances of this case it was also prejudicial error to charge the jury that they should not consider the question of damages until they first determined the question of liability. For the reasons hereinafter set forth it is concluded that the trial court properly rejected the instruction offered by plaintiff, and correctly instructed the jury on the effect to be given the alleged defamatory words; and that it committed no prejudicial error in giving the instruction of which complaint is made.

*The Facts*

The case comes before this court on a settled statement pursuant to rule 7, California Rules of Court. The incident itself is described as follows: "On the 24th day of September, 1959, Russ Arno, a singer, at the paid invitation of Dick Stewart, appeared on the latter's television program. The television program was shown on Television Station KPIX— Channel 5, licensed and operated by the Westinghouse Broadcasting Company, Inc. The program was one of a continuing series of dance shows of Dick Stewart which occur at 5 o'clock in the afternoon. The dancers are volunteer high school children. Occasionally, a performer entertains or sings, as Arno did in this instance. This was Arno's third such appearance on Dick Stewart's program. Plaintiff Arno testified that after he had sung several songs on the program, Stewart referred to Arno, in his presence, as an 'iron-clad singing member of the Mafia.' Defendant Stewart denies this, and testified that he called Arno 'my buddy from the Mafia', or 'the singing member of the Mafia.' Plaintiff admitted that the statement, however it was worded, was made in banter and without malice."

The statement further reflects: that at the trial defendants introduced evidence that "The statement by Stewart, how-

ever it may have been worded, was greeted with laughter from all, and was made in a jolly and friendly atmosphere''; and that ''The word 'Mafia' is frequently used as a gag by such television entertainers as Frank Sinatra, Dean Martin, Perry Como and others. There are many other references in television programs, in the same jocular spirit, to the Mafia, such as the identification of the Kennedy family as the 'Irish Mafia.' Such references are made and received as being humorous and nothing more.''

The evidence further establishes that plaintiff was not and never had been a member of the Mafia and that Stewart had no basis for believing he was such; and that Stewart apologized and issued three retractions, the last of which was at the request of plaintiff's attorney; that ''Each apology and retraction emphasized that the words were spoken jocularly and in a pleasant and friendly spirit. STEWART, both in his introductory and farewell comments, complimented [plaintiff] as an entertainer, and he spoke of [plaintiff] in a very intimate, warm and friendly way.'' The statement reveals that the evidence was conflicting as to whether or not plaintiff had lost engagements and earnings because of the broadcasted statement.

*Defamation per se*

Plaintiff requested the court to charge the jury that the statement was slanderous on its face and that the right of plaintiff to recover damages by reason of its publication was absolute if it was false.[1] The contention that the instruction should have been given, and that it was error to refuse to give it is predicated upon the well recognized principle that the question of whether or not the utterance is reasonably susceptible of a defamatory meaning is a question of law for the court. (*MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 546 [343 P.2d 36]; *Maher* v. *Devlin* (1928) 203 Cal. 270, 278 [263 P. 812]; *Mellen* v. *Times-Mirror Co.* (1914) 167 Cal.

---

[1]The instruction as proposed reads: ''I instruct you that the statement complained of was and is slanderous on its face if false and the same was unprivileged. No claim of a public demand for news, or of the peculiar nature and magnitude of television work will excuse television defamation and leave the party thereby injured without recompense for the wrong committed. The statement complained of in the case being libelous and unprivileged, the right of the plaintiff to recover damages by reason of its publication is absolute if you find that the publication complained of was false. The questions, therefore, for you to determine are whether the statement was true or false and, if false, the amount of damages to which, under all the circumstances shown by the evidence, the plaintiff is entitled.''

587, 593 [140 P. 277, Ann.Cas. 1915C 766]; *Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 410 [46 Cal.Rptr. 135]; *White* v. *Valenta* (1965) 234 Cal.App.2d 243, 257 [44 Cal.Rptr. 241]; *Mercado* v. *Hoefler* (1961) 190 Cal.App.2d 12, 21 [11 Cal.Rptr. 787].)

When the material published is unambiguous and actionable on its face it is proper to so instruct the jury and to refuse to permit the publisher to show that the utterance was used and understood in an innocent sense. (*Maher* v. *Devlin, supra,* 203 Cal. 270, 278-281; *Mercado* v. *Hoefler, supra,* 190 Cal.App.2d 12, 20-23; and see *Williams* v. *Daily Review, Inc., supra,* 236 Cal.App.2d 405, 411.) Conversely, if the material published is not fairly susceptible of a defamatory meaning it is proper to dismiss the action. (*Mellen* v. *Times-Mirror Co., supra,* 167 Cal. 587, 593.)

"[I]f the language of the article is capable of two meanings, one of which is harmless and the other libelous, and it is alleged that the same was used and understood as conveying the latter meaning, a cause of action is stated, and it is the province of the jury to determine in which sense the language was used and understood by the readers of the article." (*Mellen* v. *Times-Mirror Co., supra,* 167 Cal. 587, 593; accord: *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 546 (libel); *Williams* v. *Daily Review, Inc., supra,* 236 Cal.App.2d 405, 410-411 (libel); *White* v. *Valenta, supra,* 234 Cal.App.2d 243, 257-258 (slander); and recognized: *Maher* v. *Devlin, supra,* 203 Cal. 270, 278 (libel); 3 Rest., Torts (1938) § 614, p. 304.) Under such circumstances it is error to charge that the publication is not actionable per se and put the plaintiff to proof of special damages where such proof would not be necessary if the jury accepted the defamatory meaning. (*Williams* v. *Daily Review, Inc., supra,* 236 Cal.App.2d 405, 411-413.)

Plaintiff asserts that regardless of whose version is accepted, the words spoken attributed to him membership in the Mafia, and thereby identified him as a member of "a hereditary Sicilian organization, conspiratorial in nature, violent in deed, and criminal in every aspect." How the nature of this organization was so established is not revealed by the record. Defendants, in the retraction appended to their answer, did acknowledge that it was an organization of doubtful or unworthy reputation; and it appears to be assumed by all concerned that such is its nature. For purposes of this opinion that assumption is accepted, and the question of whether the court should take judicial notice of the existence or nature of

the Mafia is left unresolved.[2] (As to Communist Party cf. *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 546; *Black* v. *Cutter Laboratories* (1955) 43 Cal.2d 788, 798-806 [278 P.2d 905]; and *Farr* v. *Bramblett* (1955) 132 Cal.App.2d 36, 48 [281 P.2d 372], with *Harris* v. *Curtis Publishing Co.* (1942) 49 Cal.App.2d 340, 348 [121 P.2d 761]; *Gallagher* v. *Chavalas* (1941) 48 Cal.App.2d 52, 58-59 [119 P.2d 408].) In any event, the innuendos asserted in plaintiff's second cause of action properly raised the issue of the nature of the organization and it may be assumed, despite the brevity of the record before this court, that the jury were permitted to speculate as to common understanding of the existence and nature of the organization.

The acceptance of plaintiff's definition of the nature of the organization does not resolve the question. ■ Defamation by radio or television broadcast is treated as slander in this state. (See Civ. Code, §§ 46 and 48.5, subd. (4); *White* v. *Valenta, supra,* 234 Cal.App.2d 243, 254; *Correia* v. *Santos* (1961) 191 Cal.App.2d 844, 850-851 [13 Cal.Rptr. 132].) It may be assumed that an unqualified reference to membership in an organization of the nature described by plaintiff could establish slander per se because it either charged him with a crime (Civ. Code, § 46, subd. 1), or tended to injure him in respect to his business (Civ. Code, § 46, subd. 3; *Mercado* v. *Hoefler, supra,* 190 Cal.App. 12, 20-21). (Cf. *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 547 (libel); and see 3 Rest. Torts (1938) § 559, com. e, illus. 2, pp. 141-142.) The facts, however, do not show such an unqualified assertion.

■ The following principle expressed in *Bettner* v. *Holt* (1886) 70 Cal. 270 [11 P. 713], is applicable: "not only is the language employed to be regarded with reference to the actual words used, but according to the sense and meaning under all the circumstances attending the publication which such language may fairly be presumed to have conveyed to those to whom it was published. So that in such cases the language is uniformly to be regarded with what has been its effect, actual or presumed, and its sense is to be arrived at with the help of

---

[2]Dictionary definitions indicate that in Sicily the word stands for popular sentiment of hostility to the law, and also is used to refer to the body of persons imbued with that sentiment which in time developed into a loosely organized secret society. Its use to designate an organization in other countries is in some cases qualified by reference to it as a "supposed organization." (Cf. Webster's Third New International Dictionary (1961), Unabridged, with *id.* (2d ed. 1939); Funk & Wagnalls Practical Standard Dictionary (1930).)

the cause and occasion of its publication.'' (70 Cal. at p. 274; accord: *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 546-547; *Stevens* v. *Storke* (1923) 191 Cal. 329, 334 [216 P. 371] ; *Correia* v. *Santos, supra,* 191 Cal.App.2d 844, 851-852; *Blake* v. *Hearst Publications Inc.* (1946) 75 Cal.App.2d 6, 11-12 [170 P.2d 100] ; 3 Rest., Torts (1938) § 563, coms. d and e, pp. 148-149.)

In the instant case there was evidence to show that reference to the Mafia had been frequently used as a gag in a jocular manner by other entertainers; and that on the occasion in question the reference was made in a jolly and friendly atmosphere and was greeted with laughter from all. Plaintiff conceded that the statement was made in banter and without malice. The trier of fact could well infer that this setting and the reaction of plaintiff and the studio audience to the remarks were carried to the viewers and auditors with the statement itself. The entire auditory and visual impression therefore was open to the construction, urged herein by defendants, that it could only be interpreted as a joke.

Resort to humor will not preclude responsibility for defamatory matter, but a distinction may be drawn between jocular utterances which are intended to be and are susceptible of a defamatory interpretation; those which are made without intent to defame but which may be susceptible to such an interpretation, and those which are made without intent to defame and which are not reasonably subject to such an interpretation.

Prosser has the following comments on the matter at hand: ''One common form of defamation is ridicule. It has been held to be defamatory to publish humorous articles, verses, cartoons or caricatures making fun of the plaintiff, to heap ironical praise upon his head, to print his picture in juxtaposition with an article on evolution and a photograph of a gorilla, or with an optical illusion of an obscene and ludicrous deformity, readily detected at second glance. It is of course possible that humor may be understood by all who hear or read it as good-natured fun, not to be taken seriously or in any defamatory sense; but when it carries a sting and causes adverse rather than sympathetic or neutral merriment, it becomes defamatory. Thus a speech made after dinner, understood by all present as a harmless joke, may amount to libel when it is published in a newspaper and reaches those who do not understand the circumstances.'' (Prosser, The Law of Torts (3d ed. 1964) § 106, pp. 759-760.) ''In order that the defend-

ant's words may be defamatory, they must be understood in a defamatory sense. It is not necessary that anyone believe them to be true, since the fact that such words are in circulation at all concerning the plaintiff must be to some extent injurious to his reputation—although obviously the absence of belief will bear upon the amount of the damages. There must be, however, a defamatory meaning conveyed. Thus it is always open to the defendant to show that the words were not understood at all, that they were taken entirely in jest, or that some meaning other than the obvious one was attached by all who heard or read." (*Id.*, pp. 763-764.)

The authors of the Restatement of the Law of Torts phrased the following comments: "In determining the meaning of a communication, account is to be taken of all the circumstances under which it is made so far as they were known to the recipient. Words which if isolated from the circumstances under which they were uttered might appear defamatory, may in fact not have been so understood by the person to whom they were published. A statement prima facie defamatory may have been uttered in jest by the speaker and may have been so understood by those who heard him. Epithets which would ordinarily be defamatory may have been uttered on an occasion and under circumstances such that no sensible man would take them literally. On the other hand, an apparently flattering statement may be reasonably understood in a defamatory sense by reason of the publisher's recognizably ironical manner. In such a case, the decisive question is what the person or persons to whom the communication was published reasonably understood as the meaning intended to be expressed; unless this is free from reasonable doubt, it is for the jury to determine the meaning and construction of the alleged defamatory language." (3 Rest., Torts (1938) § 563, com. e, p. 149.)

█ "The fact that the defamer intends his language to be understood only as a joke is immaterial if, by a reasonable construction thereof, it is not so understood. On the other hand the publisher's attitude of mind, if known, may prevent his words from being understood in a defamatory sense. █ Thus, if a speaker is known to be jesting or using the vernacular of the community, words which otherwise would be defamatory on their face may be deprived of their disparaging import. Men frequently employ in a rough and ready way language which, although usually defamatory on its face, is understood only as an expression of affection among such

persons. Accusations which under some circumstances would import the most heinous of crimes, when obviously made in jest, may be incapable of a derogatory implication. So too, accusations which on their face are ordinarily defamatory may be understood by those who hear them as merely general terms of abuse and not to be taken in their literal significance." (*Id.*, § 580, com. d, pp. 207-208.) As an illustration the authors suggest: "A, a prospector in Alaska, on meeting in a saloon a friend of previous years smilingly holds out his hand and exclaims, in the hearing of others, 'How are you, you old horse thief?' A has not published a slander." (*Id.*, Illus. 5, p. 208.)

In California the courts have recognized that the jocular intent of the publisher will not relieve him from liability if it is reasonable to not understand the utterance as a joke. (*Ervin* v. *Record Publishing Co.* (1908) 154 Cal. 79, 82 [97 P. 21, 18 L.R.A. N.S. 622]; and see: *Newby* v. *Times-Mirror Co.* (1916) 173 Cal. 387, 393-394 [160 P. 233, Ann.Cas. 1917E 186]; *Menefee* v. *Codman* (1957) 155 Cal.App.2d 396, 409 [317 P.2d 1032]; and *Megarry* v. *Norton* (1955) 137 Cal.App.2d 581, 583 [290 P.2d 571].) In *Ervin* the defendant questioned the sufficiency of the complaint and the court observed: "It is not necessary here to decide whether or not the article is libelous *per se*, but the best that can be said of it is, that it is upon its face equivocal and capable of a meaning injurious to the plaintiff of the character stated in the innuendo." (154 Cal. at p. 81.) In *Menefee* the words expressed were intended to be and were in fact published under circumstances which manifested an intention to convey their plain meaning. The court found them libelous per se (155 Cal.App.2d 402-406), but in its instructions recognized that under other circumstances the publisher might show that the words were spoken in jest (*id.*, p. 409).

These cases cover the first category noted above and demonstrate that the mere jocular nature of an intended derogatory remark will not prevent it from being actionable. In the third category *Blake* v. *Hearst Publications Inc.*, *supra*, 75 Cal.App. 2d 6, demonstrates that although a picture or a caricature might be derogatory when considered alone, it cannot be divorced from its accompanying text. Where the latter is laudatory and explains the picture, no action will lie. (75 Cal.App.2d at p. 12.)

In *Hanson* v. *Feuling* (1915) 160 Wis. 511 [152 N.W. 287], it was contended that the words were spoken and understood

as a joke. The lower court instructed that such fact if established could only be considered in mitigation of damages. The opinion on appeal states: "This part of the charge is clearly erroneous. Under the testimony the jury would have been entitled to find that the words were spoken as joking or jesting remarks and so understood; and, if so spoken and so understood by those who heard them, they would not be actionable. The jury would understand from the above charge that, although so spoken, still the defendant would be liable, and the fact that they were spoken by way of a jest, and so understood, could only be considered in reduction of damages. In view of the evidence in the case, it cannot be said that this charge was not prejudicial." (160 Wis. at p. 513; see also: *Lamberti* v. *Sun Printing & Publishing Assn.* (Sup. Ct., App. Div. 1906) 111 App. Div. 437 [97 N.Y.S. 694]; *Berry* v. *City of New York Ins. Co.* (1923) 210 Ala. 369 [98 So. 290]; and Annotation 77 A.L.R.2d 612 (1961).)

In *Lamberti* it was alleged that a published account of a joke in which plaintiff had been branded as a member of a band known as the "Black Hand" by his friends, subjected him to the charge that he was in fact a member of that band. The court said: "Any fair-minded man—any man of ordinary ability and intelligence—reading the entire print, could not so construe it. He who runs [*sic*] would read it as the story of a practical joke, based on a physical pun (the existence of a 'black hand' on the plaintiff's back), and published to provoke laughter." (111 App. Div. at p. 440, 97 N.Y.S. at p. 695.) The court therein ordered the demurrer to the complaint sustained.

So in this case a fair-minded man could construe the whole visual and auditory publication as a practical joke without reference to the truth of the alleged membership. It is concluded that it would have been error to disassociate the alleged derogatory phrase from its context and to give the unqualified instruction offered by plaintiff that the statement alone was defamatory per se.

The jury were properly instructed in the language of section 46 of the Civil Code.[3] In regard to defendants' contention that the words were manifestly spoken in jest the court

[3]This instructions reads: "Now, you are instructed that Section 46 of the Civil Code of this state defines slander as follows: 'Slander is a false and unprivileged publication, orally uttered, and also includes communications by radio or any other mechanical or other means which: 1. Charges any person with crime or with having been indicted, con-

instructed as follows: "You are instructed that in determining the question presented to you as to whether the statement made by Dick Stewart was slanderous, that it is the law that one cannot justify his conduct in assailing the reputation of another by saying that he acted merely in jest, unless it is perfectly manifest from the language employed that it can in no respect be regarded as an attack upon the person to whom it relates.

"You are instructed, therefore, that if you find it was perfectly manifest from the language employed and from all of the evidence bearing upon the subject that the statements made could in no respect be regarded as an attack upon the plaintiff, then such statements shall not be considered slanderous."

This instruction has good antecedents. The first sentence is predicated upon the instruction found in the *Menefee* case (155 Cal.App.2d at p. 409). The language may be traced back through *Lamberti* (111 App.Div. at p. 441, 97 N.Y.S. at p. 696) to *Triggs* v. *Sun Printing & Publishing Assn.* (1904) 179 N.Y. 144 [71 N.E. 739, 103 Am.St.Rep. 841], wherein the opinion recites: "It is likewise claimed by the respondent that these articles were written in jest, and hence that it is not liable to the plaintiff for the injury he has sustained. It is, perhaps, possible that the defendant published the articles in question as a jest, yet they do not disclose that, but are a scathing denunciation, ridiculing the plaintiff. If, however, they can be regarded as having been published as a jest, then it should be said that however desirable it may be that the readers of and the writers for the public prints shall be amused, it is manifest that neither such readers nor writers should be furnished such amusement at the expense of the reputation or business of another. In the language of Joy, C. B.: 'The principle is clear that a person shall not be allowed to murder another's reputation in jest;' or, in the words of Smith, B., in the same case: 'If a man in jest conveys a serious imputation, he jests at his peril.' (*Donoghue* v. *Hayes* [1831], Hayes, Irish Exchequer, 265, 266.) We are of the opinion that one assaulting the reputation or business of another in a

victed or punished for crime; 3. Tends directly to injure him in respect to his office, profession, trade or business either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profits or which, by natural consequence, causes actual damage.' ''

public newspaper cannot justify it upon the ground that it was a mere jest, unless it is perfectly manifest from the language employed that it could in no respect be regarded as an attack upon the reputation or business of the person to whom it related." (179 N.Y. at p. 155 [71 N.E. at pp. 742-743].)

It is unnecessary to determine whether that instruction unduly shifted the burden of proof, or placed a greater burden of proof on the defendants than the law warrants. These are matters of which plaintiff cannot complain.

The instruction proposed by plaintiff would, in view of the acknowledged falsity of the statement and the absence of privilege, establish defamation as a matter of law. This is a different question from the establishment that the published matter is defamatory per se. "It is only when the language is susceptible solely of a defamatory meaning, and it is not possible for a jury to determine that the publication was used and understood in a non-defamatory way, that it would be proper for a trial court to resolve the issue of libel (aside from the issues of truth and privilege) in favor of a plaintiff without submitting this issue to the jury or, in other words, to determine that the publication was libelous as a matter of law." (*Williams* v. *Daily Review, Inc., supra,* 236 Cal.App. 2d 405, 411.) The court exercised its judgment and ruled that the publication as a whole was susceptible of a defamatory interpretation when it permitted the case to go to the jury under the instructions noted above. (See *White* v. *Valenta, supra,* 234 Cal.App.2d 243, 257-258.)

If he desired an instruction on the effect to be given the words which were uttered, if they were not published and understood to be in jest, he should have proffered such a qualified instruction. (See *Hardin* v. *Elvitsky* (1965) 232 Cal.App.2d 357, 369-374 [42 Cal.Rptr. 748]; and *Morris* v. *Associated Securities, Inc.* (1965) 232 Cal.App.2d 220, 228-230 [42 Cal.Rptr. 607].)

There was no error in refusing plaintiff's proffered instruction.

*Damages and Liability*

The facts reflect that plaintiff demanded and that defendants published a correction or retraction as provided in section 48a of the Civil Code, which provides in part: "In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall

recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. . . ."

The court instructed the jurors: "not to select a single instruction or a portion of an instruction alone, but to consider all of the instructions in determining any issue in this case." Following its further general instructions concerning the performance of their duties, the court gave instructions on weighing the testimony of witnesses and the burden of proof, which in turn were succeeded by two more instructions on credibility.

The trial judge then launched into the questions of substantive law. He gave the instructions on slander and statements made in jest which have been set forth above. These two instructions were followed by a reference to the language of the first sentence of section 48a of the Civil Code as quoted above, the procedure required by that section to demand a correction, and the effect of a failure to publish a correction after demand. The court then gave definitions of general and special damage as extracted from the section.[4] The jurors were then charged: "Now, you are instructed that if you find that a correction or a retraction of the alleged slanderous statements was broadcast on a regular broadcast on September 25, 1959, or on October 6, 1959, or on October 15, 1959, or on any of those dates, in substantially as conspicuous a manner on said broadcasting station as were the statements claimed to be slanderous, then if there is any liability as a result of the alleged slanderous statements, the plaintiff shall recover no more than the special damages, as already defined to you, and sustained by him as a result of such alleged slander.[5]

"If you find that the statements made by the defendant Stewart were slanderous and that said retraction was not

---

[4]This instruction reads: "That same section, Section 48 (a), defines the terms general and special damages which I have just mentioned and provides as follows: That general damages are damages for loss of reputation, shame, mortification and hurt feelings, if any.

"Special damages are defined by the same section as being all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, if any, including such amounts of money as the plaintiff proves he has expended, if any, as a result of the alleged slander and no other."

[5]Civil Code section 48a is silent in regard to the effect that a publication of a correction has on the right to, or measure of, damages. (See 2 Witkin, Summary of Cal. Law, Torts, § 127, at p. 1300.) The propriety of this instruction is not passed on herein as it was not referred to as a point on appeal in the settled statement prepared pursuant to rule 7(a), California Rules of Court. ( *White* v. *Valenta* (1965) 234 Cal.App.2d 243, 258 [44 Cal.Rptr. 241].)

made in substantially as conspicuous a manner as were the original statements, then you may award both general and special damages as those terms have been defined to you.''

There followed an instruction elaborating on the elements of general damages and another advising the jury that the plaintiff was entitled to a presumption that he enjoyed a good name and reputation in his profession at the time of the publication.

In summary, up to this point, the court had instructed the jury that special damages were a material consideration, as a condition of a right to recover, if plaintiff was going to rely upon subdivision 5 of section 46 of the Civil Code which gives a right of action for a false and unprivileged communication by radio or any mechanical means ''Which, by natural consequence, causes actual damage.'' It further appeared that a showing of special damage would be required if the jury found there was no correction demanded, or, if they found a correction was demanded and was in fact made as required by Civil Code section 48a.

With this background the court took up the question of the measure of damages and prefaced its remarks with the following instruction: ''Now, you are instructed further that in this case it is the duty of the jury first to ascertain whether or not there is any liability upon the part of the defendants. The question of damages is not to be considered for any purpose by the jurors in the jury room until they have first decided whether or not the defendants are liable. Damages can only be awarded if there is a liability on the part of the defendants under the facts and under the law.''

The court then advised the jurors that the giving of instructions on damages should not be taken as an indication that liability was or was not established; and that damages should be reasonable. The instructions concluded with directions concerning the manner of deliberating and the use of proposed verdicts.

Plaintiff asserts that the instruction last quoted above took away from the jury all consideration of liability upon any one of the three theories which depended upon the establishment of special damages.

In *Condon* v. *Ansaldi* (1928) 203 Cal. 180 [263 P. 198], the facts revealed that the nature of the plaintiff's injuries might have had an important part in determining whether or not defendant was negligent because their serious nature was inconsistent with defendant's version of the accident. The

court upheld the action of the trial court in granting a new trial on grounds which included error in charging the jury, " 'You are to determine the question of negligence without regard to any injury the plaintiff may have sustained.' " (203 Cal. at p. 182.) To the same effect is *Simmons* v. *Lamb* (1939) 35 Cal.App.2d 109 [94 P.2d 814], wherein a similar instruction was held erroneous because the nature of the injuries suffered was a fact which was relevant to the disputed issue of whether the claimant was driving the car. (35 Cal. App.2d at pp. 113-114.)

In *Boots* v. *Potter* (1954) 122 Cal.App.2d 927 [263 P.2d 176, 39 A.L.R.2d 1], the court considered a similar instruction and found no error because there was no uncertainty as to how the accident occurred. The foregoing cases were so distinguished. (122 Cal.App.2d at pp. 939-941.)

In *Sebrell* v. *Los Angeles Ry. Corp.* (1948) 31 Cal.2d 813 [192 P.2d 898], the jurors were instructed to determine whether plaintiff's injuries were such as to deprive her of her memory so that she would be entitled to a presumption that she exercised reasonable care for her own safety. The trial court also gave an instruction along the lines of those being considered. Because of a difference in wording the opinion distinguished *Simmons* v. *Lamb, supra*, and concluded: ''The instruction could reasonably be understood as requiring the jury merely to separate in its deliberations the *question* of injuries and damages from the *question* of liability. Such separation of the two distinct issues in the deliberations of the jury could be observed even though the jury would have to consider plaintiff's injuries in determining whether she suffered a loss of memory entitling her to the presumption. If the two instructions are read together, it is clear the jury could not reasonably doubt that it could consider plaintiff's injuries in determining whether plaintiff suffered the loss of memory on which her right to the presumption depended.'' (31 Cal.2d at p. 817.) The case was resolved on a question of conflicting instructions which was not involved in the precedents upon which plaintiff relies herein.

It is concluded that the resolution of the conflict in this case is governed by the principles in *Sebrell* wherein it is stated: ''Instructions that are contradictory in essential elements may warrant the reversal of a judgment on the ground that it cannot be ascertained which instruction was followed by the jury. [Citations.] In determining whether there is such a conflict the decisive question is whether the instructions read

as a whole and in the light of the circumstances of the case in which they were given, are apt to confuse a person of ordinary intelligence. It is common knowledge that instructions, like statutes, may include in addition to a general rule a special rule applicable only in particular circumstances and that the special rule qualifies the general. [Citations.] In the present case the instruction relating to the presumption required the jury to consider a particular consequence of plaintiff's injuries for the purpose specified in the instruction. No explicit statement was necessary to make a person of ordinary intelligence understand that a consideration of plaintiff's injuries in conformity with this instruction would not violate the general instruction that the jury determine the question of liability before it considered the question of injuries or damages.'' (*Id.*, pp. 817-818.)

In other words, it should be assumed that the jurors performed their duty to consider all of the instructions in determining any issue in the case, and that as persons of ordinary intelligence they considered the question of whether plaintiff had *suffered* any actual damages, as it may have been necessary in determining the question of the liability of defendants, and withheld consideration of the damages to be *awarded* plaintiff until the question of liability was resolved.

No prejudicial error is found in the instructions so reviewed as a whole.

The judgment is affirmed.

Sullivan, P. J., and Molinari, J., concurred.