[Civ. No. 15133.   Second Dist., Div. One.   June 19, 1946.]

AL BLAKE, Appellant, v. HEARST PUBLICATIONS INCORPORATED (a Corporation) et al., Respondents.

Harold A. Fendler and Bertin A. Weyl for Appellant.

Lawler, Felix & Hall, John M. Hall and A. Laurence Mitchell for Respondents.

YORK, P. J.—Plaintiff by the instant action sought damages from defendants in the sum of $160,000 for the publication of alleged libelous matter consisting of a cartoon strip entitled "Betrayal from the East."

The original complaint alleged that the defendants, Hearst Publications Incorporated, and King Features Syndicate, had

libeled the plaintiff by publishing in the Los Angeles Examiner, a newspaper of general circulation of more than half a million readers in the city of and county of Los Angeles, a series of eight separate cartoon strips each entitled "Betrayal from the East," consisting of a series of pictures expressly identifying the plaintiff by name and depicting him as a "degenerate, dissolute, disheveled, slovenly and unkempt person, addicted to the use of narcotics and with a physical and facial appearance characteristic of a person addicted to the use of narcotics, and which pictures and each of them, did expose the plaintiff to hatred, contempt, ridicule and obloquy, and which had a tendency to, and still have a tendency to, injure him in his reputation, and in his occupation and profession of acting and lecturing upon the public lecture platform, and which have caused plaintiff to sustain severe shock, strain, great mental anguish, mortification, humiliation and shame . . ."; that such pictures were false and defamatory and did not truly nor correctly represent, depict, portray or picture the plaintiff's true physical or facial appearance; that at the time defendants published said pictures, they knew that the pictures were false and untrue and did not truly nor correctly depict plaintiff's true physical or facial appearance.

The trial court sustained a demurrer to the complaint on the ground that the pictures themselves should have been incorporated in said complaint, whereupon plaintiff filed an amended complaint, in practically the same words as the original, and attached thereto by reference the said pictures.

Defendants denied generally and specially all the allegations as to the defamatory character of the publications, and as separate defenses alleged (a) "that to the extent that said pictures purported to depict plaintiff, the same were a truthful portrayal of plaintiff's appearance during the events narrated in the text which said pictures were designed to illustrate"; (b) "that none of the pictures complained of purported to portray the real Al Blake, but on the contrary all of them purported to and were understood to portray Al Blake while he was engaged in acting the part of such depraved and despicable character."

During the trial defendants made a motion for a directed verdict, which was by the court denied. Thereafter, the jury returned its verdict for $15,000 in favor of the plaintiff, whereupon the defendants moved for a judgment notwithstanding the verdict, which motion was granted. Both of said motions

were made on the following grounds: That plaintiff had no case (1) "because the pictures do not convey the defamatory meaning ascribed to them by the pleaded innuendo"; (2) "because the pleaded innuendo is not supported by any pleaded inducement"; (3) "because the pictures are at least susceptible of innocent interpretation and no special damages have been pleaded."

This appeal is prosecuted by plaintiff from such judgment notwithstanding the verdict.

In support of the judgment notwithstanding the verdict, respondents urge (1) that the pictures were not defamatory, and hence were not actionable; (2) that even if the pictures be regarded as susceptible of a defamatory meaning, they were also susceptible of an innocent meaning, hence were not libelous *per se,* and since no special damages are pleaded, they are not actionable.

It appears to be the well-established law of this state that "the power of a trial court to set aside a verdict and enter a contrary judgment is absolutely the same as its power to grant a nonsuit. (Sec. 629, Code Civ. Proc.; *Card* v. *Boms,* 210 Cal. 200 [291 P. 190]; *Hunt* v. *United Bank & Trust Co. of California,* 210 Cal. 108 [291 P. 184]; 7 Cal.Jur. 10-Yr. Supp. 268, sec. 65c.) Therefore, a motion for judgment *non obstante veredicto* may properly be granted 'when, and only when, disregarding conflicting [adverse] evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' (*Card* v. *Boms, supra,* at p. 202.)" *Neel* v. *Mannings, Inc.,* 19 Cal.2d 647, 649 [122 P.2d 576]. Moreover, the power of the court in passing upon such a motion is strictly limited. "It has no power to weigh the evidence, but is bound to view it in the most favorable light in support of the verdict. . . . In other words, the function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict. Although the trial court may weigh the evidence and judge of the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict." (*Collins* v. *Nelson,* 16 Cal.App.2d 535, 538 [61 P.2d 479].)

Appellant took the stand and testified, briefly, as follows: During the early part of 1941, he was approached by a Japanese ex-employee of Charles Chaplin, who inquired if the appellant had not been previously enrolled in the United States Navy, and specifically if he did not then have friends in the Navy. Appellant invented a story of an imaginary friend who he stated was the admiral's personal yeoman on the U.S.S. Pennsylvania, flagship of the United States Fleet, stationed at Honolulu, and also stated that he (appellant) was desperately in need of money. An appointment was arranged for the following day with a Japanese from Washington, D. C., who offered appellant several thousand dollars if Blake were "willing to play ball with the Japanese." Appellant reported these conferences to the United States Naval Intelligence at Los Angeles, and agreed to accept employment as a counterespionage agent. Part of the plan concocted by Naval Intelligence was to place another secret agent on board the U.S.S. Pennsylvania at Pearl Harbor, who would masquerade as the fictitious friend of the appellant. Thereafter, appellant informed the Japanese that he had contacted his friend on the U.S.S. Pennsylvania, and he was asked to leave for Honolulu immediately in order to secure any naval records which might be of value to the Japanese Imperial Navy.

Appellant arrived in Honolulu, registered at the Royal Hawaiian Hotel, contacted his fictitious friend on the U.S.S. Pennsylvania, and secured from him documents prepared by United States Naval Intelligence for transmission to the Japanese which "had it been used by the Japanese would have done them more harm than good." For this service, appellant received $5,000 from the Japanese which he "turned over to Naval Intelligence to be used for evidence." Appellant then made arrangements for a second trip to Honolulu for the ostensible purpose of securing additional Naval information to be sold to the Japanese and upon his return to the United States, he cooperated with the United States Navy and the Federal Bureau of Investigation in arresting the heads of the Japanese spy ring in Los Angeles. Appellant testified that during the entire time he was employed by Naval Intelligence, he used no make-up of any character and used ordinary business and sport clothes. Snapshots of appellant taken upon his Hawaiian trip were received in evidence as Exhibits 14 and 15. He here claims that a comparison of Exhibits 1 to 8, inclusive (the cartoon strips published in the Examiner), fully cor-

roborate his express testimony that none of the cartoon-illustrations truthfully or correctly depicted his appearance at the time in question. He expressly testified that he never dressed or appeared as depicted in the cartoons.

Appellant further testified that he was 58 years of age and had lived in California for about 45 years; that he was engaged in the profession of lecturer upon the public platform at the time the respondents' publications appeared; that he received a "terrible shock" when he saw himself depicted in the illustrations as a degenerate and depraved character; that he sustained a serious physical and nervous reaction which required treatment by a physician; that he was unable to work for weeks after the publications and "would suddenly break out in a cold sweat and raise up in bed"; was unable to hold food on his stomach and was confined to his home for two months after the publications appeared during which period his weight decreased from 136 pounds to 118 pounds, and that it was several months before he was able to resume his work of lecturing. "As a matter of fact, it is just recently here that I have gotten to a point where I can give a fairly comprehensive talk on the subject that I spoke of."

An examination of the record herein discloses that the alleged libelous cartoons were accompanied by and were designed to illustrate the text of a so-called best seller written by Alan Hynd, which was based upon the experience of appellant in the role of a counter-espionage agent, as recited in appellant's testimony hereinbefore set out. The story, published as a serial in the Los Angeles Examiner, began on March 23, 1944, and the text thereof, illustrated by the first three pictures or cartoons appearing on that date, stated among other things that "Throughout this maze of spying and counterspying there were many heroic and dramatic roles played by individual Americans, Federal agents and just plain citizens. But the story of Al Blake probably tops them all in stark drama. In the fall of 1940, Blake, an alert-looking man of middle age, was part owner of an exhibit at Treasure Island during the San Francisco World Fair. He was a former vaudeville and screen performer known as 'King of the Robots.' He had remarkable control over his voluntary and involuntary muscles, and could stand immobile for hours."

The text which was illustrated by the last three pictures in the group complained of, i. e., the publication of April 4, 1944, stated: "Al Blake's true role in this drama of spy and

counterspy did not come out until after Pearl Harbor. The King of the Robots today can well regard himself as a true patriot. Pearl Harbor, as bad as it was, would have been considerably worse, had it not been for his intelligent, courageous counter-espionage." Between the two dates mentioned, the stories continued from day to day accompanied by the illustrations of which appellant complains. In the language of respondents, these stories told "of Blake's adventures while acting under orders from the United States Office of Naval Intelligence . . . of the dangers encountered and surmounted by Blake in this patriotic work . . . risking his life to fool Japanese agents. There is nothing in the text which so much as hints at anything derogatory in Blake's behavior, motives, morals or habits. On the contrary, the narrative as it unfolds shows how Blake's unfailing intelligence and adroitness enabled him to frustrate wickedness and emerge a hero."

Obviously, the cartoons were not meant to be a true portrayal of appellant's physical appearance, but rather were intended to represent the part he played as a counterspy. While they may have been extremely distasteful to him, they were in no sense defamatory, even when viewed without the accompanying text. True, he is shown clad in a plaid suit, smoking cigarettes and sitting at a bar mostly in company with Japanese, and in several instances he is shown in what might be regarded as an emaciated and disheveled condition, owing mainly to the fact that the illustrations were somewhat crudely drawn, but there is nothing vulgar, contemptuous or ridiculous about them. However, in determining whether the published articles constituted a libel, both the text and the cartoons must be taken into consideration, because as stated in the case of *Stevens* v. *Storke,* 191 Cal. 329, 334 [216 P. 371] : "Section 45 of the Civil Code provides: 'Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.' In determining whether or not, under this definition, an article is libelous, it must be considered in its entirety. It may not be divided into segments and each portion treated as a separate unit. (*Van Vactor* v. *Walkup,* 46 Cal. 124; *Brewer* v. *Chase,* 121 Mich. 526 [80 Am. St.Rep. 527, 46 L.R.A. 397, 80 N.W. 575] ; *Graves* v. *Waller,*

19 Conn. 90.) Thus, in *Bettner* v. *Holt,* 70 Cal. 270 [11 P. 713], it was held that in determining whether or not a libel was charged, 'a court of justice is to put such construction upon the words which it contains as may be derived "as well from the expressions used as *from the whole scope and apparent object of the* writer" (*Spencer* v. *Southwick,* 10 Johns. (N.Y.) 259; *Cooper* v. *Greely,* 1 Denio (N.Y.) 358).' (Italics ours.)" See, also, *Bates* v. *Campbell,* 213 Cal. 438, 441 [2 P.2d 383]; *Rosenberg* v. *J. C. Penney Co.,* 30 Cal.App.2d 609, 619 [86 P.2d 696], and cases there cited.

▆▆▆ When considered as illustrations of the accompanying text which described appellant in terms of glowing praise, it must have been obvious to the most casual reader of the publication that appellant was portrayed, not actually, but in a role assumed by him for the purpose of deceiving the Japanese: i. e., a derelict character, who would betray his country for money.

Appellant, in support of his contention that a picture or caricature, with or without words, may be defamatory and constitute a libel, calls attention to the case of *Gloria* v. *A Colonia Portuguesa,* 128 Cal.App. 640, 644 [18 P.2d 87], where, quoting from the opinion, "appellant newspaper published a cartoon of an ass in grotesque form, which the complaint alleges and the evidence shows was intended to portray and represent respondent, and that it was so understood by many readers of the appellant newspaper. Printed with the cartoon was certain reading matter, published in the Portuguese language, which by innuendo charged respondent with corruptly and dishonestly accepting money for defending said member who by innuendo was referred to as a 'wild boar', all of which, so the complaint alleges and the evidence tended to show, was done maliciously and with intent to injure, defame and disgrace him, and to expose him to hatred, contempt, ridicule and obloquy, and to injure his good reputation and the business of the newspaper he was publishing. Without further describing the cartoon or the reading matter accompanying the same, it will be sufficient to say that the same constituted a libel. . . ." From the foregoing, it can readily be seen that the court in the cited case in making its decision considered the article in its entirety, to wit: The cartoon and the accompanying reading matter.

An examination of the entire record herein leads to the conclusion that there is no evidence of sufficient substantiality

to support the verdict in favor of appellant, and therefore, that the trial court properly granted respondents' motion for judgment notwithstanding the verdict.

For the reasons stated, the judgment is affirmed.

Doran, J., and White, J., concurred.

A petition for a rehearing was denied July 9, 1946, and appellant's petition for a hearing by the Supreme Court was denied August 15, 1946.  Carter, J., voted for a hearing.