[No. A029779. First Dist., Div. Two. July 24, 1985.]

POLYGRAM RECORDS, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF NAPA COUNTY, Respondent;
DAVID H. REGE, Real Party in Interest.

544

COUNSEL

Robert S. Besser, Margolis, Burrill & Besser, James T. Fousekis, James F. Brelsford and Steinhart & Falconer for Petitioners.

No appearance for Respondent.

Bradley P. Elley for Real Party in Interest.

## OPINION

KLINE, P. J.—This case poses the question, among others, whether a joke may give rise to a cause of action for defamation.

Petitioners, comedian Robin Williams (Williams), cable television programmer Home Box Office (HBO), Simon & Schuster, Inc., Paramount

Pictures Corp., Time-Life Films, Inc., Polygram Records, Inc., Casablanca Records, Inc., Mr. Happy Productions, Inc., and Little Andrew Enterprises, Inc., seek a writ of mandate to compel the respondent court to set aside its order overruling their demurrers, based upon failure to state a cause of action, to the first amended complaint of real party in interest, David H. Rege (Rege), and to enter an order sustaining their demurrers. We issued an order to show cause and stayed the proceedings in the court below. We now determine that the demurrers must be sustained and accordingly direct the issuance of a peremptory writ.

Focusing solely upon a joke told by Williams during a comedy performance at the Great American Music Hall, a San Francisco nightclub, Rege's amended complaint sets forth causes of action asserting "trade libel," personal defamation, intentional and negligent infliction of emotional distress, invasion of privacy, and intentional and negligent interference with prospective economic advantage.[1] All of the causes of action were premised upon injury and damage allegedly arising out of the publication of the joke through either distribution of record albums or audio tapes of Williams' comedy performance, distribution of video tapes of the performance, or the displaying of the performance over HBO cable television.[2]

Rege brought suit individually and dba Rege Cellars and Rege Wine Cellars. He alleged that since 1977 he has sold and distributed assorted varieties of "Rege" brand wines from his San Francisco store, Rege Cellars. He claimed to have suffered damage and injury through publication of essentially the same joke in two slightly different versions, one distributed in audio format and the other in video format.

Rege alleged that the audio format version was distributed through record albums and tapes entitled "Throbbing Python of Love," composed of a performance by Williams containing the following words: "Whoa—White Wine. This is a little wine here. If it's not wine it's been through somebody already. Oh.—There are White wines, there are Red wines, but why are there no Black wines like: REGE, a MOTHERFUCKER. It goes with fish, meat,

---

[1] Without objection, Williams requested the trial court to take judicial notice of the fact that he is a well-known comedian with a reputation for specializing in impromptu or improvisational humor. It is unclear from the record before us whether the court did so. This court does judicially notice such fact. (See Evid. Code, §§ 452, subd. (g), 459.)

[2] Petitioners Mr. Happy Productions, Inc. and Little Andrew Enterprises, Inc. are companies owned by Williams. Polygram Records, Inc. and Casablanca Records, Inc. were sued based upon distribution of the performance in audio format. HBO, Time-Life Films, Inc., Paramount Pictures Corp. and Simon and Schuster, Inc. were sued based upon distribution of the performance in video format.

any damn thing it wants to. I like my wine like I like my women, ready to pass out."[3]

The complaint alleged that the video format version was distributed through "On Location" cable television broadcasts, composed of a performance by Williams containing the following words: "There are White wines, there are Red wines, but why are there no Black wines like: REGE a MOTHERFUCKER. It goes with fish, meat, any damn thing it wants to. [¶] (Comment from a member of the audience) [¶] Thank you Lumpy. [¶] Isn't it nice, though, having someone like Mean Joe Green advertising it—You better buy this or I'll nail your ass to a tree."[4]

Rege avers in his complaint that the above statements caused damage to his business by conveying a meaning that his wines were inferior. Petitioners contend that the complaint fails to state a cause of action because (1) the joke, told as part of a comedy performance, cannot under the circumstances be reasonably understood as any serious or literal statement of fact and is fully protected speech under the First Amendment and article I, section 2 of the California Constitution;[5] (2) Rege's claim that the joke is defamatory because it purportedly associated his products with black consumers should be rejected as a matter of law; (3) the joke is purely an expression of opinion and as such is not actionable; and (4) the joke cannot reasonably be understood as being "of and concerning" Rege's products. We agree with petitioners' first two contentions and find it unnecessary to reach the third and fourth.

### I.

The parties all contend, and we agree, that the central question in this case is whether Williams' joke is as a matter of law actionable as defamation. The parties maintain, however, that this issue arises not simply in connection with Rege's three causes of action expressly alleging defama-

---

[3]We have quoted exactly from the complaint (and will do so again in setting forth the video format version complained of), including spelling, punctuation and capitalization. Petitioners in their points and authorities have spelled the name in the joke "Reggie." The record is unclear as to the pronunciation of Rege's name. He has attached to his points and authorities a copy of a newspaper article which indicates that it may be pronounced in four different ways. We will assume for purposes of this opinion that both "Rege" and "Reggie" are pronounced phonetically as "Reh-gee."

[4]For convenience, we hereafter refer to both versions of the joke by the singular term "joke," except where it is necessary to differentiate between them.

[5]Petitioners suggest that greater freedom of speech protections are provided by the California Constitution than by the United States Constitution. Due to the conclusions we reach in this opinion, it is not necessary to address that issue. For convenience, "First Amendment" will be used to refer to the free speech guarantees of both constitutions except where the context demonstrates that the reference is to the federal provision only.

tion—which respectively relate to publication of the joke by audio recording, cable television and videotape—but as well as a result of three corresponding causes of action for "trade libel." Though the basis upon which we resolve this case does not compel us to address the issue of "trade libel," we think it appropriate to briefly do so in the exercise of our power "to insure the just and rational development of the common law in our state." (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 394 [115 Cal.Rptr. 765, 525 P.2d 669].)

 "Trade libel," which has been defined by one California court as "an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff" (*Erlich* v. *Etner* (1964) 224 Cal.App.2d 69, 73 [36 Cal.Rptr. 256]), is a confusing concept that has not been subjected to rigorous judicial analysis in California.[6] The confusion arises primarily from uncertainty whether "trade libel" should be treated as a species of defamation, as all parties herein appear to believe, or instead constitutes the distinct tort of injurious falsehood, which "usually involves the publication of matter disparaging to the property in land, chattels or intangible rights or disparaging to their quality." (Rest.2d Torts (1977) div. 6, ch. 28, Introd. Note, p. 333.) The concept is also confusing because of the lack of clarity whether, as the name suggests, "trade libel" can only be occasioned by "a publication by writing . . . or other fixed representation to the eye" (Civ. Code, § 45 [definition of libel]) or whether publication may also be uttered orally or by other means; that is, whether "trade libel" may be effected by slander (see Civ. Code, § 46 [definition of slander]).

The Restatement view is that, like slander of title, what is commonly called "trade libel" is a particular form of the tort of injurious falsehood and need not be in writing. This is so, according to the Restatement, "because the earliest cases were those of written aspersions cast upon the quality of the plaintiff's goods by which he was prevented from selling them, and the decisions went upon a supposed analogy to personal defamation. The extension of liability to other forms of injurious falsehood has left 'trade libel' as a mere name occasionally applied to this particular type. The name no longer has any significance of its own; and in particular it is to be noted that actionable disparagement of quality need not be in writing." (Rest.2d Torts, *supra*, § 626, com. a, p. 346.)

 As the Restatement points out, and as the commentators agree, the torts of injurious falsehood and defamation "protect different interests and

---

[6] In addition to *Erlich* v. *Etner, supra*, 224 Cal.App.2d 69, 73, the concept of "trade libel" has been very briefly touched upon in only two other California cases, *Albertini* v. *Schaefer* (1979) 97 Cal.App.3d 822, 826 [159 Cal.Rptr. 98] and *Shores* v. *Chip Steak Co.* (1955) 130 Cal.App.2d 627, 630 [279 P.2d 595]. (See also, *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386 [182 Cal.Rptr. 438].)

have entirely different origins in history. The action for defamation is to protect the personal reputation of the injured party; it arose out of the old actions for libel and slander. The action for injurious falsehood is to protect economic interests of the injured party against pecuniary loss; it arose as an action on the case for the special damage resulting from the publication. [¶] From the beginning, more stringent requirements were imposed upon the plaintiff seeking to recover for injurious falsehood in three important respects—falsity of the statement, fault of the defendant and proof of damage. At common law a defamatory statement was presumed to be false and truth was a matter to be proved by the defendant; in an action for injurious falsehood, the plaintiff must plead and prove that the statement is false. At common law, a defendant in a defamation action was held to strict liability insofar as falsity of the statement was concerned; in an action for injurious falsehood he was subject to liability only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interests of the plaintiff in an unprivileged fashion. In defamation, it was only in [a] limited number of situations that a plaintiff was required to prove special damages; in injurious falsehood, pecuniary loss to the plaintiff must always be proved." (Rest.2d Torts, *supra,* § 623A, com. g, pp. 340-341; Prosser & Keeton, Torts (5th ed. 1984) § 128, pp. 962-977; 1 Harper & James, The Law of Torts (1956) § 6.4, pp. 486-489; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 330, pp. 2596-2597; see also, Note, *Corporate Defamation and Product Disparagement: Narrowing the Analogy to Personal Defamation* (1975) 75 Colum.L.Rev. 963, 968; *Developments in the Law—Competitive Torts* (1964) 77 Harv.L.Rev. 888, 893; Comment, *The Law of Commercial Disparagement* (1953) 63 Yale L.J. 65.)

■ Thus, despite the fact that what has come to be known as "trade libel" is similar to defamation in that both involve the imposition of liability for injuries sustained through publication to third parties of a false statement affecting the plaintiff, the two torts are distinct; that is, "trade libel" is not true libel and is not actionable as defamation. Admittedly, the statutory definitions of libel and slander, which are the means by which defamation may be effected (Civ. Code, § 44), could be expansively construed so as to embrace "trade libel." Civil Code section 45 defines libel as including a "false and unprivileged publication by writing . . . which has a tendency to injure [any person] in his occupation." Similarly, under Civil Code section 46, slander includes "a false and unprivileged publication, orally uttered . . . which: . . . [t]ends directly to injure [any person] in respect to his . . . trade or business . . . by imputing something with reference to his . . . trade [] or business that has a natural tendency to lessen its profits." (Civ. Code, § 46; see also *Albertini* v. *Schaefer, supra,* 97 Cal.App.3d 822, 830, and *Di Giorgio Fruit Corp.* v. *AFL-CIO* (1963) 215 Cal.App.2d 560,

571 [30 Cal.Rptr. 350], holding that corporate reputation is protected by Civ. Code, § 46.) However, we read these statutes as concerned with statements that cast aspersions upon the plaintiff directly or by imputation fairly implied, not statements that, though disparaging of the quality of his business or goods, do not call into question the plaintiff's honesty, integrity or competence or reasonably imply any reprehensible personal characteristic. (See *Shores* v. *Chip Steak Co.*, *supra*, 130 Cal.App.2d 627, 630.) We recognize that the distinction between personal aspersion and commercial disparagement will sometimes be difficult to draw, because statements may effectuate both harms. "It might be possible to imply some accusation of personal inefficiency or incompetence, at least, in nearly every imputation directed against a business or its product. The courts have gone to some lengths, however, in refusing to do so, particularly where the most that can be made out of the words is a charge of ignorance or negligence." (Prosser & Keeton, Torts, *supra*, § 128, p. 965, fns. omitted; Rest.2d Torts, *supra*, § 623A, com. g, p. 341.)

■ The allegations set forth in Rege's causes of action denominated "trade libel" do not make out a claim of defamation. These causes of action are all based upon the principal assertions that "Defendant WILLIAMS' statements disparaged plaintiff's . . . business and goods in that defendant WILLIAMS' statements falsely indicated that plaintiff's . . . business goods were of inferior quality," and that "[a]s a proximate result of defendants' publication of the statements, prospective customers have been deterred from buying plaintiff's wines and from otherwise dealing with plaintiff, and plaintiff has thereby suffered injury to his business and sales of his wine, as well as loss of investors and prospective investors in his business, all in an amount according to proof at trial."

Accepting these allegations as true, as for present purposes we must, it seems to us clear that false statements simply indicating that plaintiff's business goods "were of inferior quality," though conceivably tortious as injurious falsehoods, do not accuse plaintiff of dishonesty, lack of integrity or incompetence nor even imply any reprehensible personal characteristic, and are therefore not defamatory.

■ ■ ■ ■ Thus the question of defamation, to which we now turn, arises in this case solely as a result of those causes of action for personal defamation, which assert that publication of the statements caused Rege embarassment, humiliation, ridicule and anxiety.[7] Our resolution of the defamation claims dispenses of all others.

---

[7]Action may be brought in the same suit for both the torts of injurious falsehood and defamation, so long as the damages are not duplicated. (Rest.2d Torts, *supra*, § 623A, com. g, p. 341.)

## II.

■ The question whether a statement is defamatory can be reached on a demurrer as a matter of law. (*Okun* v. *Superior Court* (1981) 29 Cal.3d 442, 449-451, 460 [175 Cal.Rptr. 157, 629 P.2d 1369], cert. den., 454 U.S. 1099 [70 L.Ed.2d 641, 102 S.Ct. 673]; *Tschirky* v. *Superior Court* (1981) 124 Cal.App.3d 534 [177 Cal.Rptr. 357]; *Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 805-806 [163 Cal.Rptr. 628, 608 P.2d 716].) If the material complained of is not fairly susceptible of a defamatory meaning, it is proper to dismiss the action. Conversely, if the material is unambiguous and actionable on its face, it is proper to so instruct the jury and refuse to permit the publisher to show that the utterance was used and understood in an innocent sense. If the language is capable of two meanings, one harmless and one defamatory, it is the province of the trier of fact to determine in which sense the language was used and understood. (*Arno* v. *Stewart* (1966) 245 Cal.App.2d 955, 960 [54 Cal.Rptr. 392].)[8]

■ Petitioners' argue that Williams' allegedly defamatory monologue "is not actionable as a matter of law because an obvious joke, told during an obvious comedy performance, is a form of irreverent social commentary, is not taken seriously, and thus does not affect reputation in a manner actionable in defamation." For the reasons later set forth, we shall agree that the foregoing statement is a substantially accurate characterization of the facts of this case and conclude that real party's claims are therefore not legally actionable.[9] Before explaining this conclusion, however, we think it

---

[8]The determination whether a statement is defamatory is thus analogous to the legal question whether an allegedly libelous statement is one of fact or opinion. (See *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 682 [150 Cal.Rptr. 258, 586 P.2d 572], cert. den. 441 U.S. 961 [60 L.Ed.2d 1066, 99 S.Ct. 2406].)

[9]Because of this conclusion and because, in any event, petitioners do not deny that Williams' statements were published, it is unnecessary for us to attempt to determine whether the various forms of publication may technically constitute libel or slander. As earlier noted, Williams' statements, which were originally uttered orally and apparently without the benefit of a script, have been published in the form of record albums, audio tapes and videotapes; and the videotaped performance has been broadcast on cable television. While California courts have held that broadcast defamation must be treated as slander (*Arno* v. *Stewart, supra,* 245 Cal.App.2d 955, 961; *White* v. *Valenta* (1965) 234 Cal.App.2d 243, 254 [44 Cal.Rptr. 241, 13 A.L.R.3d 1271]; *Correia* v. *Santos* (1961) 191 Cal.App.2d 844, 850 [13 Cal.Rptr. 132]; see also Civ. Code, §§ 48a, 48.5.), the Restatement persuasively contends that it should instead be treated as libel (Rest.2d Torts, *supra,* § 568A, p. 182), as it is in some other jurisdictions (see, e.g. *Shor.* v. *Billingsley* (1956) 4 Misc.2d 857 [158 N.Y.S.2d 476], aff'd (1957) 4 App.Div.2d 1017 [169 N.Y.S.2d 416]). Moreover, in their video tape form, the statements could arguably be deemed "communication by . . . any mechanical means" (Civ. Code, § 46), and therefore slander, or a "publication by . . . fixed representation to the eye" (Civ. Code, § 45), and therefore libel. (See also, *American Broadcasting—Paramount Theatres, Inc.* v. *Simpson* (1962) 106 Ga.App. 230 [126 S.E.2d 873], where, in order to avoid having to make the procrustean determination whether an allegedly defamatory television broadcast constituted either libel or slander, the court created a new

necessary to clarify our position with respect to an idea vigorously advanced by petitioners in connection with the contention just set forth.

■ Petitioners do not simply maintain that the statements at issue in this case are not defamatory, but that comedy is a form of expression that is *categorically* protected by the First Amendment. They base this argument not only on the ground that humor is a useful and even necessary form of social commentary, comparable in certain respects to political speech and religious expression (see, e.g., *Salomone* v. *MacMillan Pub. Co.* (1978) 97 Misc.2d 346, 349-350 [411 N.Y.S.2d 105, 108]),[10] but on the theory that comedy is, virtually by definition, not taken seriously or literally.[11] We reject this latter theory.

First of all, the suggestion that humor cannot serve serious aims or, as one court put it, "sharpen the cutting edge of truth" (*Salomone* v. *Mac-Millan Pub. Co., supra,* 411 N.Y.S.2d at p. 108.), is not easy to reconcile

category, which it called "defamacast.") Suffice it for us to point out that the forms of publication utilized in this case cannot realistically be analyzed by reference to the traditional libel-slander dichotomy, which modern technology has rendered increasingly obsolete. (See Hofer, *Libel Law in the Twenty-First Century: Defamation and the Electronic Newspaper* (1981) 3 Comm/Ent L.J. 379; Stevens & Hoffman, *Tort Liability for Defamation by Computer* (1977) 6 Rutgers J. Computers & L. 91.)

[10]The trial judge in *Salomone* expressed this idea as follows: "[¶] Is there a recognized exception from the laws of libel when words otherwise defamatory are uttered in a humorous context? Of course, common sense tells us there must be. Humor takes many forms—sheer nonsense, biting satire, practical jokes, puns (clever and otherwise), one-liners, ethnic jokes, incongruities and rollicking parodies, among others. Laughter can soften the blows dealt by a cruel world, or can sharpen the cutting edge of truth. Without humor—the ability to recognize the ridiculous in any situation—there can be no perspective. Humor is a protected form of free speech, just as much to be given full scope, under appropriate circumstances, as the political speech, the journalistic expose, or the religious tract." (*Salomone* v. *MacMillan Pub. Co., supra,* 97 Misc.2d at pp. 349-350 [411 N.Y.S.2d at p. 108].) See also, *Berlin* v. *E.C. Publications, Inc.* (2d Cir. 1964) 329 F.2d 541, cert. den. 379 U.S. 822 [13 L.Ed.2d 33, 85 S.Ct. 46], where, with respect to an alleged copyright infringement, the court declared that ". . . as a general proposition, we believe that parody and satire *are* deserving of substantial freedom—both as entertainment and as a form of social and literary criticism" (*id.,* at p. 545), which statement was quoted with approval in *Girl Scouts of the United States of America* v. *Personality Posters Mfg. Co.* (S.D.N.Y. 1969) 304 F.Supp. 1228, 1236; and *Tetley, Inc.* v. *Topps Chewing Gum, Inc.* (E.D.N.Y. 1983) 556 F.Supp. 785, 795-796.

[11]The assertion in petitioners' brief that "humor typically is understood to be humor *and to convey no serious factual allegations about its object*" (italics added) relies solely upon Sack, Libel, Slander, and Related Problems (Practising Law Inst. 1980) page 240. While the author of this treatise does indeed state that this is "often" true, he nonetheless makes it clear that "humor . . . can give rise to causes of action for defamation" (*id.,* at p. 238) and that humor is actionable where "it is used to make a defamatory point." (*Id.,* at p. 65.) In short, as stated by an Irish court, " " "The principle is clear that a person shall not be allowed to murder another's reputation in jest" ' " and that " ' "[i]f a man in jest conveys a serious imputation, he jests at his peril." ' " (*Donoghue* v. *Hayes* (1831) Hayes, Irish Exch. 265, 266, quoted in *Salomone* v. *MacMillan Pub. Co., supra,* 97 Misc.2d at p. 351 [411 N.Y.S.2d at p. 109].)

with petitioners' concomitant assertion, which we find it easier to accept, that humor is an important form of social commentary. Furthermore, caricature, satire or other forms of humor which ridicule may in certain circumstances convey a defamatory meaning and be actionable even if the words used could not be understood in their literal sense or believed to be true. (Prosser & Keeton, Torts, *supra,* § 111, p. 780.) Most significantly, however, petitioners' argument assumes that the concept of "comedy" or "humor" can be judicially defined; for unless this is so the courts could not usefully adopt and consistently apply the rule, urged upon us, that comedy, as such, is a protected form of speech.

Comedy, "the most complex and elusive, [if] not the most profound, aesthetic attitude" (Cook, The Dark Voyage and the Golden Mean: A Philosophy of Comedy (W.W. Norton & Co. 1966) foreword), does not, in our view, admit of definition by any readily ascertainable general principle.[12] What is one man's amusement is another's calumny. (Cf. *Cohen* v. *California* (1971) 403 U.S. 15, 25 [29 L.Ed.2d 284, 293-294, 91 S.Ct. 780]; *Winters* v. *New York* (1948) 333 U.S. 507, 510 [92 L.Ed. 840, 847, 68 S.Ct. 665]; *Hannegan* v. *Esquire, Inc.* (1946) 327 U.S. 146, 157-158 [90 L.Ed. 586, 593, 66 S.Ct. 456].) Mindful that judicial efforts to define a concept similarly resistant to explication, i.e., "obscenity," have confused rather than clarified the jurisprudence of the First Amendment (see, e.g., *Interstate Circuit, Inc.* v. *City of Dallas* (1968) 390 U.S. 676, 704 [20 L.Ed.2d 225, 243-244, 88 S.Ct. 1298], conc. and dis. opn. of Harlan, J.) and because, in any event, as we explain, no definition is here necessary, we decline to undertake what would almost surely prove a quixotic endeavor. Such judicial timidity should not distress advocates of the constitutional rights of comedians and humorists; for if judges assumed the responsibility to decide what is amusing and made the protections of the First Amendment turn upon their views, perhaps less putative humor would be safeguarded than our restrained approach permits.[13] (Cf. *Federal Communications Com-*

---

[12]The validity of Samuel Johnson's observation that "comedy has been particularly unpropitious to definers," is confirmed by most who have devoted intellectual attention to the comic vision. (See, e.g., Comedy: Meaning and Form (Corrigan edit., 1965) [which collects the views of, among others, Santayana, Auden, Baudelaire and Bergson]; The Psychology of Humor: Theoretical Perspectives and Empirical Issues (Goldstein & McGhee edits., 1972); Cook, The Dark Voyage and the Golden Mean: A Philosophy of Comedy, *supra*; and Freud, Jokes and Their Relation to the Unconscious (Strachey edit. and transl., 1960) pp. 188-221.)

[13]The unpredictability of judicial endeavors to manage the mysteries of humor, and the extent to which this results from the interposition of value judgments, are illustrated by the conflict that has arisen in federal case law as to whether there is a "parody defense" to a claim of copyright infringement. In applying the common law "fair use" doctrine (codified in 17 U.S.C. § 107), which accomodates First Amendment concerns by permitting certain limited use of copyrighted material (*Roy Export Co. Establishment* v. *Columbia Broadcasting System* (2d Cir. 1982) 672 F.2d 1095, cert. den. 459 U.S. 826 [74 L.Ed.2d 63, 103

*mission* v. *Pacifica Foundation* (1978) 438 U.S. 726 [57 L.Ed.2d 1073, 98 S.Ct. 3026].)

■ The proper focus of judicial inquiry in a case such as this is not whether the allegedly defamatory statement succeeds as comedy,[14] nor whether its audience thought it to be humorous or believed it to be true; the threshold inquiry is simply whether the communication in question could reasonably be understood in a defamatory sense by those who received it. (Rest.2d, Torts, *supra,* § 563, com. c.) This is not to say that the discernibly humorous intent of the publisher is irrelevant, or that a court may not consider and give weight to the comedic context in which publication occurred, or the nature of audience response; for considerations of this sort invariably will bear upon the determination whether a defamatory meaning could reasonably be attached to the communication in question.

*Arno* v. *Stewart, supra,* 245 Cal.App.2d 955, illustrates the proper judicial approach. It was alleged in that case that the host of a television dance show (not a comedy show) had referred to the plaintiff as an "iron-clad member of the Mafia," and had thereby "identified him as a member of 'a

---

S.Ct. 60]), some federal courts have declared that parody does not constitute a "fair use" simply because it was "intended only as a joke." (*Gucci Shops, Inc.* v. *R.H. Macy & Company, Inc.* (S.D.N.Y. 1977) 446 F.Supp. 838, 840.) However, the Ninth Circuit, which had formerly agreed that "a parodized or burlesque taking is to be treated no differently from any other [copyright] appropriation" (*Benny* v. *Loew's Inc.* (9th Cir. 1956) 239 F.2d 532, 537, affd. by an equally divided court, 356 U.S. 43 [2 L.Ed.2d 583, 78 S.Ct. 667] (1958)), seems to have repudiated that view (*Walt Disney Productions* v. *Air Pirates* (9th Cir. 1978) 581 F.2d 751, 757, fn. 13, cert. den. 439 U.S. 1132 [59 L.Ed.2d 94, 99 S.Ct. 1054]), and is now apparently among those courts holding that "parody [is] protected fair use" on the theory that "in today's world of often unrelieved solemnity, copyright law should be hospitable to the humor of parody." (*Elsmere Music, Inc.* v. *National Broadcasting Co.* (2d Cir. 1980) 623 F.2d 252, 253.) An examination of the federal cases that bear upon this point, many of which involve sexually explicit subject matter, leads to the suspicion that whether the fair use defense will succeed relates to whether the parody in question offends the mores of the court. (See, e.g., *MCA, Inc.* v. *Wilson* (2d Cir. 1981) 677 F.2d 180; *Dallas Cowboys Cheerleaders, Inc.* v. *Scoreboard Posters, Inc.* (5th Cir. 1979) 600 F.2d 1184; *Walt Disney Productions* v. *Air Pirates, supra,* 581 F.2d 751; *DC Comics Inc.* v. *Unlimited Monkey Business, Inc.,* (N.D.Ga. 1984) 598 F.Supp. 110; *Walt Disney Productions* v. *Mature Pictures Corp.* (S.D.N.Y. 1975) 389 F.Supp. 1397.) In any event, there is no doubt that "judicial treatment of parody as a copyright infringement has been inconsistent and confusing." (Note, *Parody, Copyrights and the First Amendment* (1976) 10 U.S.F. L.Rev. 564.)

[14]As stated by then Presiding Justice Botein in *University of Notre Dame Du Lac* v. *Twentieth Century-Fox Film Corp.* (1965) 22 App.Div.2d 452, 458 [256 N.Y.S.2d 301, 307]: "[W]e may not import the role of literary or dramatic critic into our functioning as judges in this case; and so for purposes of the law we may not reach a conclusion that the works of fiction involved in this litigation are not artistic or literary works. . . . Whether [the work] is good burlesque or bad, penetrating satire or blundering buffoonery, is not for us to decide. *It is fundamental that courts may not muffle expression by passing judgment on its skill or clumsiness, its sensitivity or coarseness; nor on whether it pains or pleases.*" (Italics added.)

hereditary Sicilian organization, conspiratorial in nature, violent in deed, and criminal in every aspect.'" (*Id.*, at p. 960.) Pointing out that "acceptance of plaintiff's definition of the nature of the [Mafia] does not resolve the question [of defamation]" (*ibid.*), the court commenced its analysis with the following principle, first expressed by our Supreme Court in *Bettner* v. *Holt* (1886) 70 Cal. 270, 274 [11 P. 713]: "[N]ot only is the language employed to be regarded with reference to the actual words used, but according to the sense and meaning under all the circumstances attending the publication which such language may fairly be presumed to have conveyed to those to whom it was published. So that in such cases *the language is uniformly to be regarded with what has been its effect, actual or presumed, and its sense is to be arrived at with the help of the cause and occasion of its publication.*" (Italics added; accord, *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 33 [81 Cal.Rptr. 360, 459 P.2d 912]; *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 546-547 [343 P.2d 36]; *Stevens* v. *Storke* (1923) 191 Cal. 329, 334 [216 P. 371]; *Correia* v. *Santos, supra,* 191 Cal.App.2d 844, 851-852; *Blake* v. *Hearst Publications Inc.* (1946) 75 Cal.App.2d 6, 11-12 [170 P.2d 100]; *Information Control Corp.* v. *Genesis One Computer Corp.* (9th Cir. 1980) 611 F.2d 781, 784; Rest.2d, Torts, *supra,* § 563, coms. d & e, pp. 163-164.) In discussing this principle, the *Arno* court emphasized that "[r]esort to humor will not preclude responsibility for defamatory matter" (245 Cal.App.2d at p. 962), and that California courts have recognized "that the jocular intent of the publisher will not relieve him from liability if it is reasonable to not understand the utterance as a joke." (*Id.*, at p. 964.) The court also pointed out that it is not necessary that anyone believe the defendant's words in order for them to be defamatory, "since the fact that such words are in circulation at all concerning the plaintiff must be to some extent injurious to his reputation—although obviously the absence of belief will bear upon the amount of the damages. There must be, however, a defamatory meaning conveyed. Thus it is always open to the defendant to show that the words were not understood at all, that they were taken entirely in jest, or that some meaning other than the obvious one was attached by all who heard or read." (*Id.*, at p. 963, quoting Prosser, The Law of Torts (3d ed. 1964) § 106, pp. 763-764.)

Examining the "entire auditory and visual impression" created by the defendants in that case, the court in *Arno* v. *Stewart* concluded that no defamatory meaning could reasonably attach to the communication because "it could *only* be interpreted as a joke." (*Id.*, at p. 962, italics added.) This conclusion was based on evidence showing "that reference to the Mafia had been frequently used as a gag in a jocular manner by other entertainers; and that on the occasion in question the reference was made in a jolly and friendly atmosphere and was greeted with laughter from all." (*Ibid.*)

■ The substance of the communication at issue here and the context in which it was made are even more indicative that there was no defamation than were the circumstances in *Arno* v. *Stewart, supra,* 245 Cal.App.2d 955. At least in *Arno* it was conceded that the allegedly defamatory words referred to the plaintiff. Here there is a genuine dispute whether Williams' statements were intended by him or believed by others to refer to real party's products.[15] In any event, the statements, which Rege acknowledges were "made in jest," and which represented a very small part of a rather long comedy performance, were a spoof or parody of advertising practices and wine snobbery based upon the fantasy of a black wine "tough enough" to be advertised by "Mean Joe Green."[16] Williams, who was performing in a nightclub before an audience that knew him as a comedian, not a wine connoisseur, seems to have made it clear that the wine to which he referred did not exist, because his joke was constructed around the rhetorical question "why are there no black wines like . . . ." Suggestions that the hypothetical wine is a "motherfucker,"[17] black in color, tastes like urine,[18] goes with anything "it" damn well pleases, or is "tough" or endorsed by ruffians are obvious figments of a comic imagination[19] impossible for any sensible

---

[15]Rege suggests in his brief that there are facts not presently alleged in the amended complaint which make clear that Williams intended the joke to refer to his products, and that the joke was so understood by some persons. Even if that were so and such facts were alleged in a further amendment to the complaint, for the reasons set forth in this opinion no cause of action could be based upon the joke. Thus, upon remand, leave to amend must be denied because " 'there are no circumstances under which an amendment would serve any useful purpose,' " and " 'speedy resolution of cases involving free speech is desirable' " to avoid " 'a chilling effect upon the exercise of First Amendment rights.' " (*Okun* v. *Superior Court, supra,* 29 Cal.3d 442, 460, citations omitted.)

[16]We take judicial notice of the fact that there is a former professional football player with the Pittsburgh Steelers by the name of Joe Green, who is often referred to as "Mean Joe Green" and who has appeared in various television commercials. (See Evid. Code, §§ 452, subd. (g), 459.)

[17]Needless to say, it is conceptually difficult to ascribe any meaning to a view of a wine as a "motherfucker." This appears to be more fantasy than opinion, let alone a statement of fact. (See *Pring* v. *Penthouse International Ltd.* (10th Cir. 1982) 695 F.2d 438, 441, cert. den. (1983) 462 U.S. 1132 ["We have impossibility and fantasy within a fanciful story . . . . [T]he story could not be taken literally, and the portions charged as defamatory could not reasonably be understood as a statement of fact."].) For judicial disquisitions on the constitutional propriety of restricting use of the vulgarity "motherfucker" where, as is not here the case, it is "directed to the person of the hearer" (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 309 [84 L.Ed. 1213, 1221, 60 S.Ct. 900, 128 A.L.R. 1352]), see the opinions of Chief Justice Burger and Justices Powell and Rehnquist in *Rosenfeld* v. *New Jersey* (1972) 408 U.S. 901, 902, 903, 909 [33 L.Ed.2d 321, 324, 325, 92 S.Ct. 2479], (dissenting from an order vacating judgment and remanding for further consideration).

[18]There actually appears to be no support for the position that this view was expressed in the joke distributed in audio format. "Taste" was in no way mentioned.

[19]"[C]omedy begins from the absurd and the inexplicable and, like faith, tolerates the miraculous." (Sypher, *The Meanings of Comedy* in Comedy: Meaning and Form, *supra,* p. 48.)

person to take seriously.[20] For this reason, and in light of the occasion at which the joke was delivered and the attending circumstances, we conclude that, as a matter of law, it was not defamatory. To hold otherwise would run afoul of the First Amendment and chill the free speech rights of all comedy performers and humorists, to the genuine detriment of our society.

Decisions made in slightly different though still relevant contexts fully support our views. (See, e.g., *Yorty* v. *Chandler* (1970) 13 Cal.App.3d 467, 475 [91 Cal.Rptr. 709] [political cartoon could not be deemed defamatory as serious statement of fact]; *Blake* v. *Hearst Publications Incorporated, supra,* 75 Cal.App.2d 6, 11 [cartoon "extremely distasteful" to plaintiff not defamatory]; *Pring* v. *Penthouse International Ltd., supra,* 695 F.2d 438 [no reasonable reader could reasonably believe statements in sexual-humor article].)

## III.

As indicated, the defamation claim in this case rests in part on the argument that Williams' joke "associates 'Rege' brand wines with blacks," allegedly "a socio-economic group of persons commonly considered to be the antithesis of wine connoisseurs," who "harbor obviously unsophisticated tastes in wines." This argument is utterly untenable. ■ Assuming, purely for the sake of argument, that the joke did convey the meanings ascribed by Rege, he could not recover damages based upon a theory that his wine had been disparaged by association with a particular racial or ethnic group, or a segment thereof. Courts will not condone theories of recovery which promote or effectuate discriminatory conduct. (See generally *Palmore* v. *Sidoti* (1984) 466 U.S. 429 [80 L.Ed.2d 421, 104 S.Ct. 1879] [reversing state court decision denying custody to Caucasian mother who married a black man (not the father of the child) because trial court decided child would be stigmatized by private racial biases]; *Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441] [refusing to enforce racially-discriminatory restrictive covenant].) As the Supreme Court stated in *Palmore,* "the law cannot, directly or indirectly, give [private biases] effect." (*Palmore* v. *Sidoti, supra,* 466 U.S. 429, 433 [80

---

[20]Since the subject communication cannot be taken seriously, we need not consider whether it represents an "opinion" of the sort which, for constitutional reasons, is not actionable as defamation because it conveys no statement of facts. (See *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997]; *Okun* v. *Superior Court, supra,* 29 Cal.3d 442, 450.) It may be noted, however, that caustic criticism of food has been deemed an expression of opinion protected under the First Amendment. (See *Mr. Chow of New York* v. *Ste. Jour Azur S.A.* (2d Cir. 1985) 759 F.2d 219; *Mashburn* v. *Collins* (La. 1977) 355 So.2d 879 [96 A.L.R.3d 590].) Also, the humorous context in which an alleged libel was published has been deemed probative that the statements were opinion rather than fact. (*Myers* v. *Boston Magazine* (1980) 380 Mass. 336 [403 N.E.2d 376].)

L.Ed.2d 421, 426, 104 S.Ct. 1879, 1882].) Thus Rege's contention that the joke disparaged his wine products by associating them with blacks is repugnant to values embedded in our Constitution and must be resoundingly rejected.

## IV.

Since Rege's claims are all based upon publication of the joke, and because "liability cannot be imposed on any theory for what has been determined to be a constitutionally protected publication" (*Readers Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 265 [208 Cal.Rptr. 137, 690 P.2d 610]), the demurrers must be sustained as to all of Rege's alleged causes of action.

Let a peremptory writ of mandate issue commanding respondent court to vacate its order overruling petitioners' demurrers, to enter an order sustaining their demurrers and to enter a judgment of dismissal. The stay heretofore imposed shall be dissolved upon finality of this opinion.

Rouse, J., and James, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.